## UNITED STATES OF AMERICA *v.* AMERICAN TOBACCO COMPANY.

## AMERICAN TOBACCO COMPANY *v.* UNITED STATES OF AMERICA.

**APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.**

Nos. 118, 119. Argued January 3, 4, 5, 6, 1910; restored to docket for reargument April 11, 1910; reargued January 9, 10, 11, 12, 1911.—Decided May 29, 1911.

*Standard Oil Co.* v. *United States, ante,* p. 1, followed and reaffirmed as to the construction to be given to the Anti-trust Act of July 2, 1890, c. 647, 26 Stat. 209; and *held* that the combination in this case is one in restraint of trade and an attempt to monopolize the business of tobacco in interstate commerce within the prohibitions of the act.

In order to meet such a situation as is presented by the record in this case and to afford the relief for the evils to be overcome, the Anti-trust Act of 1890 must be given a more comprehensive application than affixed to it in any previous decision.

In *Standard Oil Co.* v. *United States, ante,* p. 1, the words "restraint of trade" as used in § 1 of the Anti-trust Act were properly construed by the resort to reason; the doctrine stated in that case was in accord with all previous decisions of this court, despite the contrary view at times erroneously attributed to the expressions in *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, and *United States* v. *Joint Traffic Association,* 171 U. S. 505.

The Anti-trust Act must have a reasonable construction as there can scarcely be any agreement or contract among business men that does not directly or indirectly affect and possibly restrain commerce. *United States* v. *Joint Traffic Association,* 171 U. S. 505, 568.

The words "restraint of trade" at common law, and in the law of this country at the time of the adoption of the Anti-trust Act, only embraced acts, contracts, agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or by unduly obstructing due course of trade, and Congress intended that those words as used in that act should have a like significance; and the ruling in *Standard Oil Co.* v. *United States, ante,* p. 1, to this effect is reëxpressed and reaffirmed.

The public policy manifested by the Anti-trust Act is expressed in such general language that it embraces every conceivable act which can possibly come within the spirit of its prohibitions, and that policy cannot be frustrated by resort to disguise or subterfuge of any kind.

The record in this case discloses a combination on the part of the defendants with the purpose of acquiring dominion and control of interstate commerce in tobacco by methods and manners clearly within the prohibition of the Anti-trust Act; and the subject-matters of the combination and the combination itself are not excluded from the scope of the act as being matters of intrastate commerce and subject to state control.

In this case the combination in all its aspects both as to stock ownership, and as to the corporations independently, including foreign corporations to the extent that they became coöperators in the combination, come within the prohibition of the first and second sections of the Anti-trust Act.

In giving relief against an unlawful combination under the Anti-trust Act the court should give complete and efficacious effect to the

prohibitions of the statute; accomplish this result with as little injury as possible to the interest of the general public; and have a proper regard for the vested property interests innocently acquired. In this case the combination in and of itself, and also all of its constituent elements, are decreed to be illegal, and the court below is directed to hear the parties and ascertain and determine a plan or method of dissolution and of recreating a condition in harmony with law, to be carried out within a reasonable period (in this case not to exceed eight months), and, if necessary, to effectuate this result either by injunction or receivership.

Pending the achievement of the result decreed all parties to the combination in this case should be restrained and enjoined from enlarging the power of the continuation by any means or device whatever.

Where a case is remanded, as this one is, to the lower court with directions to grant the relief in a different manner from that decreed by it, the proper course is not to modify and affirm, but to reverse and remand with directions to enter a decree in conformity with the opinion and to carry out the directions of this court with costs to defendants.

164 Fed. Rep. 700, reversed and remanded with directions.

THE facts, which involve the construction of the Antitrust Act of July 2, 1890, and the question whether the acts of the defendants amounted to a combination in restraint of interstate commerce in tobacco, are stated in the opinion.

*The Attorney General* and *Mr. James C. McReynolds* for the United States:

What constitutes or materially affects interstate or foreign commerce is a practical question to be decided upon a view of the facts presented in each case. *Rearick v. Pennsylvania*, 203 U. S. 507, 512; *Western Union Tel. Co. v. Kansas*, 216 U. S. 1; *International Text Book Co. v. Pigg*, 217 U. S. 91; *Dozier v. Alabama*, 218 U. S. 124. In the constantly recurring course of affairs commerce among the States passes through three stages: soliciting orders; manufacturing the goods; transporting them to the purchaser. And each is an essential of the entire movement. Soliciting orders undoubtedly is inter-

state commerce, *Robbins* v. *Shelby County,* 120 U. S. 489. Transporting the manufactured article likewise is clearly of the same. The manufacture is as essential as either of the other elements; and some restrictions upon it, as all know, affect the very foundations of interstate trade.

The commerce clause gives Congress power to indicate its will in conformity to which interstate commerce shall be carried on. This is supreme and admittedly extends to whatever is itself interstate commerce, and all instrumentalities and persons engaged therein. Legislation which directly regulates any of these things comes clearly within the constitutional grant. *Delaware & Hudson R. R. Co.* v. *United States,* 213 U. S. 366. And, consequently, whenever manufacture can be regarded as a part of such commerce Congress may inhibit a monopoly thereof, as in so doing it would be directly regulating commerce.

The granted power may be made effective by all means reasonably necessary therefor. Experience demonstrates that the indicated will of Congress concerning interstate trade and commerce may be directly hindered, obstructed and nullified by some things which are no part thereof. Whatever of these, therefore, as an efficient cause, will probably occasion as a natural and reasonable consequence material obstruction or hindrance to the efficacious operation of its lawful will, Congress may prohibit. A monopoly of production, as the efficient cause, may occasion material hindrance or obstruction to such operation of the indicated will of Congress, and in that event may be prohibited because of this effect although manufacture be regarded as no part of commerce. *Gibbons* v. *Ogden,* 9 Wheat. 1, 195, 208, 209; *United States* v. *Coombes,* 12 Pet. 72, 78; *The Daniel Ball,* 10 Wall. 557.

Where matters of economic opinion or theory are elements for consideration and conclusions depend thereon, the courts must accept whatever declaration Congress has

made in respect of them, and frame their judgments in harmony therewith, unless such declaration is plainly without reasonable foundation. *National Cotton Oil Co.* v. *Texas*, 197 U. S. 115.

Contracts, combinations, conspiracies and monopolies which directly and materially hindered or obstructed interstate or foreign commerce were unlawful prior to the act of July 2, 1890.

The principles of the common law are applicable to interstate commerce transactions. *Western Union Telegraph Company* v. *Call.* 181 U. S. 92, 102. Without congressional enactment, every contract, combination, conspiracy or monopoly, unlawful at common law, would be so regarded by the Federal courts although relating solely to interstate or foreign commerce; and certainly no affirmative aid would be given to the purposes of any of them.

Congress has power "To Regulate Commerce with Foreign Nations, and Among the Several States, and with the Indian Tribes." Except as limited by other provisions, this power is supreme and cannot be abridged by State, individual or corporation.

Inaction by Congress indicates its will that interstate and international commerce shall be free; and therefore whatever substantially obstructs, interferes with or hampers such commerce conflicts with the will of Congress and the Federal Constitution. *Leisy* v. *Hardin*, 135 U. S. 100; *Re Rahrer*, 140 U. S. 545; *Rhodes* v. *Iowa*, 170 U. S. 412; *Adams Express Co.* v. *Kentucky*, 206 U. S. 129, 135; *Atlantic Coast Line* v. *Wharton*, 207 U. S. 328, 334; *Adams Express Co.* v. *Kentucky*, 214 U. S. 218.

The doctrine that inaction by Congress is equivalent to a positive declaration that commerce shall be free and untrammeled and that whatever substantially interferes with or hampers the same is in conflict with the Constitution of the United States rests upon the intention of

Congress reasonably implied from its silence in respect to the subject of commerce. *Bowman* v. *Chicago &c. R. R. Co.*, 125 U. S. 465, 482.

Contracts, combinations, conspiracies and monopolies may and often do prevent the free flow of commerce—substantially obstruct, interfere with and hamper the same. *Addyston Pipe Case*, 175 U. S. 211; *Loewe* v. *Lawlor*, 208 U. S. 274.

If state legislation which substantially hinders or obstructs commerce is invalid, because in conflict with the contrary intention of Congress reasonably implied from silence, *a fortiori* is this true of any arrangements by corporations which bring about like results.

In the absence of express legislation any contract, combination, or other arrangement by corporations which directly and materially hinders, restrains or obstructs the free flow of interstate or foreign commerce would be unlawful. *Re Debs*, 158 U. S. 564, 577, 599; *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Galveston R. R.* v. *Texas*, 210 U. S. 217; *Caldwell* v. *North Carolina*, 187 U. S. 622. How far the courts, in the absence of a statute, could prevent and restrain such obstructions, or whether parties thereto might be prosecuted criminally, it is not necessary to discuss, since the Anti-trust Act now clearly applies to them.

The anti-trust provisions of the Wilson Tariff Act (1894) apply to any combination or agreement intended to restrain free competition when one of the parties is engaged in importing.

These provisions have not been construed by this court. They denounce every combination, one party to which is engaged in importing, when intended to restrain lawful commerce or free competition therein. The language differs somewhat from the Sherman Act, not improbably because of prior opinions in the lower Federal courts. *Re Greene*, 52 Fed. Rep. 104; *United States* v. *Trans-Missouri*

*Freight Assn.*, 53 Fed. Rep. 440; 58 Fed. Rep. 58; *United States* v. *E. C. Knight Co.*, 60 Fed. Rep. 934.

The Sherman Act prescribes the rule of free competition in its broad and general sense and denounces contracts, combinations and conspiracies in whatever form which in effect or necessary tendency directly and materially obstruct interstate or foreign commerce. The natural effect of, competition is to increase commerce; to extinguish or prevent the free play of competition is to hinder it.

The rights of an individual acting alone are not involved in the present controversy. (Concurring opinion of Justice Brewer in *Northern Securities Case*.)

The record reveals gross violations of the anti-trust statutes within any construction consistent with repeated decisions of this court; if limited to unreasonable restraints the present case would be clearly within them. And if duress, and wicked and unfair methods are essential, they all appear. ..

Interstate commerce is a term of very large significance. It comprehends intercourse for the purposes of trade in any and all forms, including transportation, purchase, sale and exchange of commodities between citizens of different States. Regulation and commerce are both practical conceptions, and their limits must be fixed by practical lines. *Addyston Pipe Co.* v. *United States*, 175 U. S. 211; *Caldwell* v. *North Carolina*, 187 U. S. 622, 632; *Montague & Co.* v. *Lowry*, 193 U. S. 38; *Swift & Co.* v. *United States*, 196 U. S. 375; *Rearick* v. *Pennsylvania*, 203 U. S. 507, 512; *Galveston R. R.* v. *Texas*, 210 U. S. 217, 225.

The anti-trust laws must be reasonably construed with a view to practical enforcement, and not so as to defeat the purposes leading to their enactment. "Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd

conclusion." *Lau Ow Bew* v. *United States,* 144 U. S. 47,
59; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505,
567; *Hopkins* v. *United States,* 171 U. S. 578, 600; *Anderson* v. *United States,* 171 U. S. 604, 616; *Swift & Company*
v. *United States,* 196 U. S. 375, 396; *Cincinnati Packet
Company* v. *Bay,* 200 U. S. 179, 184.

The general principles adopted in reference to state
legislation affecting interstate commerce are applicable
for determining whether combinations of corporations or
individuals materially affect the free flow of such commerce. The validity of such state legislation turns upon
whether its direct effect or necessary tendency is the material or substantial restraint, hindrance or obstruction of
commerce. If so, it is unconstitutional irrespective of
intent. But if the effect is only immaterial and incidental
this does not invalidate. *Asbell* v. *Kansas,* 209 U. S. 251,
256; *Galveston &c. R. R.* v. *Texas,* 210 U. S. 217, 227;
*Minnesota* v. *Barber,* 136 U. S. 313, 319; *Richmond &c.
R. R. Co.* v. *Patterson,* 169 U. S. 311, 314; *Chicago &c.
R. R.* v. *Solan,* 169 U. S. 133; *Missouri &c. R. R.* v. *Haber.*
169 U. S. 613, 626; *Bowman* v. *Chicago &c. R. R. Co.,* 125
U. S. 465, 482; *Smith* v. *Alabama,* 124 U. S. 465, 473.

The Sherman Act applies when the direct result or necessary tendency of the prohibited thing—contract, combination, etc.—is material obstruction, hindrance or restraint of interstate or foreign commerce. This thing need
not be any part of commerce, nor be done by parties engaged therein. And whether such obstruction, hindrance,
restraint or tendency exists must be determined by the
court upon the facts of each case. That which did not restrain commerce fifty years ago may do so to-day. *Loewe*
v. *Lawlor,* 208 U. S. 274, 293; *Union Bridge Company* v.
*United States,* 204 U. S. 364, 400; *Pennsylvania* v. *Wheeling
Bridge Co.,* 13 How. 518, and 18 How. 421.

The settled rule, and one constantly invoked by those
engaged in interstate commerce, is that any state statute

which in effect or necessary tendency directly and materially obstructs or hinders the free flow of interstate commerce conflicts with the Federal Constitution. Certainly one purpose of the Sherman Act was to prevent any such interference with commerce through contracts, combinations, conspiracies or monopolies (*Loewe* v. *Lawlor*), and if state statutes are cut down because of congressional intent inferred from silence, there can be no question of the power of Congress by a positive enactment to destroy obnoxious arrangements amongst individuals or corporations. The interpretation of the Sherman Act expounded in the unanimous opinion in *Loewe* v. *Lawlor* supports this suggestion.

The natural effect of competition in its broad and legitimate sense is to increase trade. To suppress such competition restrains, hinders and obstructs trade within the meaning of the Anti-trust Act. *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505; *Addyston Pipe Co.* v. *United States*, 175 U. S. 211; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *United States* v. *Standard Oil Co.*, 173 Fed. Rep. 177. This rule is especially rigid in respect of public service corporations. *Gibbs* v. *Consolidated Gas Co.*, 130 U. S. 396; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290; but it is applicable to all commerce.

Persons of sound mind are presumed to intend the necessary or ordinary consequences of their acts, *Clarion Bank* v. *Jones*, 21 Wall. 325, 337; and, in general, the intent consciously entertained or dominant in the minds of parties to a combination is not material—certainly not decisive of its legality. Where attempts to monopolize are charged, or where essential to show a plan not necessarily inferred from circumstances, or where the effect of established acts may be doubtful, the actual purpose may be material—perhaps essential. *United States* v. *Trans-Mo.*

*Ft. Assn.*, 166 U. S. 290, 341, 342; *Addyston Pipe Co.* v. *United States*, 175 U. S. 211, 234; *Swift & Co.* v. *United States*, 196 U. S. 375, 396.

The fundamental design of the anti-trust legislation is not punishment of immorality, but prevention of mischief consequent upon unification of control and destruction of competition. The public is chiefly concerned about practical results—not mental attitudes. The lawfulness of a combination cannot be determined by the conscious purpose of the parties; necessary consequences are presumed to have been intended. *United States* v. *Trans-Mo. Ft. Assn.*, 166 U. S. 290; *United States* v. *Joint Traffic Assn.*, 171 U. S. 562; *Addyston Pipe Co.* v. *United States*, 175 U. S. 211, 234.

The word "unreasonable" cannot be read into the first section of the Sherman Act; but this does not render the prohibitions applicable merely because commerce is in some way affected, or to transactions always enforceable, and never regarded as objectionable from any standpoint. This court has never declared unlawful those ordinary business arrangements always sanctioned at common law and wholly outside the mischief intended to be prevented. Any act, however, although entirely innocent when standing alone may be criminal if part of an unlawful plan. *United States* v. *Joint Traffic Assn.*, 171 U. S. 505, 567, 568; *Hopkins* v. *United States*, 171 U. S. 578, 600; *Aikens* v. *Wisconsin*, 195 U. S. 194, 205; *Swift & Company* v. *United States*, 196 U. S. 375, 396; *Cincinnati Packet Co.* v. *Bay*, 200 U. S. 179.

The Government does not maintain that restraint, obstruction or hindrance of commerce is denounced by the act unless direct and material either in tendency or effect; and, of course, do not insist that every contract or arrangement which merely eliminates a competitor in interstate trade is for that sole reason unlawful. The statute was intended to foster, not destroy, business operations

universally regarded as promotive of public welfare. The suggestion that the statute denounces as criminal every party to any sort of contract which eliminates any independent dealer in interstate commerce however insignificant is untenable. But when, as in the present case, the restraint is the direct consequence of or that to which the challenged contract or combination necessarily tends, and is also of a material or substantial character it is clearly within the prohibition. The Government does not avouch and will not attempt to support this extreme construction which was adopted by the presiding judge below.

Contracts, combinations or conspiracies which give power materially to restrain commerce and indicate a dangerous probability of its exercise and those which necessarily tend to monopoly are unlawful without more. *United States* v. *E. C. Knight Co.*, 156 U. S. 1; *United States* v. *Trans-Missouri Ft. Assn.*, 166 U. S. 290; *Northern Securities Company* v. *United States*, 193 U. S. 197; *United States* v. *Standard Oil Co.*, 173 Fed. Rep. 177. The essential purpose of the statute is to prevent injury—not merely to reverse a course of conduct.

The words, "contract, combination and conspiracy" in the statute are used in their ordinary sense, and there is no exception in favor of sales, conveyances or other executed arrangements. *Pettibone* v. *United States*, 148 U. S. 197, 203; Noyes on Intercorporate Relations, §§ 324 *et seq.*

The decision in *United States* v. *E. C. Knight Company* turned upon the conclusion that under the peculiar circumstances of that case what was alleged and proved did not show a direct or necessary obstruction to interstate commerce; and it may be relied upon only where the evidence requires a like finding on that point. The facts of the present case render such a conclusion impossible. The things done had direct reference to interstate and foreign

commerce; competition therein has been effectively destroyed and monopoly secured. In support of the foregoing doctrines, see *United States* v. *E. C. Knight Company* (1895), 156 U. S. 1; *Pearsall* v. *Great Northern R. R. Co.* (1896), 161 U. S. 646; *United States* v. *Trans-Missouri Freight Assn.* (1897), 166 U. S. 290; *United States* v. *Joint Traffic Assn.* (1898), 171 U. S. 505; *Hopkins* v. *United States* (1898), 171 U. S. 578; *Anderson* v. *United States* (1898), 171 U. S. 604; *Addyston Pipe & Steel Company* v. *United States* (1899), 175 U. S. 211; *Montague & Company* v. *Lowry* (1903), 193 U. S. 38; *Northern Securities Company* v. *United States* (1904), 193 U. S. 197; *Harriman* v. *Northern Securities Company* (1905), 197 U. S. 244; *Swift & Company* v. *United States* (1905), 196 U. S. 375; *Cincinnati etc., Packet Co.* v. *Bay* (1906), 200 U. S. 179; *Loewe* v. *Lawlor* (1908), 208 U. S. 274. See also *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115; *Shawnee Compress Co.* v. *Anderson,* 209 U. S. 423; *Continental Wall Paper Co.* v. *Voight,* 212 U. S. 227; *Pennsylvania Sugar Refining Company* v. *American Sugar Refining Co.,* 166 Fed. Rep. 254; *Bigelow* v. *Calumet & Hecla Mining Company,* 167 Fed. Rep. 704, 721; *National Fireproofing Company* v. *Mason Builders Assn.,* 169 Fed. Rep. 259; *United States* v. *Standard Oil Co.,* 173 Fed. Rep. 177.

Monopoly is the outcome of the practical cessation of effective business competition. This word in the Anti-Trust Act has no reference to a grant of special privileges but is used in a broad sense. Trade and commerce in any commodity are monopolized whenever as the result of the concentration of competing businesses—not occurring as an incident to the orderly growth and development of one of them—one or a few corporations (or persons) acting in concert practically acquire power to control prices and smother competition.

The rights of an individual acting alone are not involved and it is unnecessary to inquire how far his acts

may be limited. Corporations do not have all the constitutional rights of an individual and are themselves combinations subject to the rules of law applicable to acts done in concert.

The word "monopolize" has no reference to a governmental grant. Congress was striking at an existing evil—unification of control with consequent destruction of competition through powerful organizations. The essential idea of monopoly is ability to control prices or to deprive the public of advantages flowing from free competition. Whether the power has been actually exercised, or prices or the total volume of trade increased or diminished is immaterial; and its existence must be determined by practical consideration of existing conditions, giving due weight to the peculiarities of the commerce involved. It is certain that where parties have deliberately pursued a course, the ordinary result or necessary tendency of which is monopoly, they cannot be heard to deny an unlawful intent; and a monopoly acquired through contract, combination or conspiracy which directly and essentially destroys competition clearly is unlawful. *United States* v. *Trans-Mo. Ft. Assn.*, 166 U. S. 290; *Addyston Pipe Co.* v. *United States*, 175 U. S. 211; *Swift & Co.* v. *United States*, 196 U. S. 375.

The courts have long referred to "monopoly" the outcome of individual action as distinguished from governmental grant, and have declared unlawful every arrangement tending thereto. The word in the Sherman Act has the same significance as in the well-known opinions, from *Mitchell* v. *Reynolds*, 1 P. Williams, 181, to *Continental Wall Paper Co.* v. *Voight*, 212 U. S. 227; *United States* v. *Addyston Pipe Co.*, 85 Fed. Rep. 271; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 16; *Pearsall* v. *Great Northern Railway Co.*, 161 U. S. 644; *United States* v. *Freight Association*, 166 U. S. 290 323; *National Cotton Oil Co.* v. *Texas*, 197 U. S. 115; *Rawnee Compress Co.* v. *Anderson,*

209 U. S. 423, 433; *People v. North River Sugar Refining Co.*, 54 Hun, 354; *American Biscuit Co. v. Klotz*, 44 Fed. Rep. 721, 724; *Richardson v. Buhl*, 77 Michigan, 632; *Pocahontas Coke Co. v. Powhatan C. & C. Co.*, 60 W. Va. 508; *Harding v. American Glucose Co.*, 182 Illinois, 619, 620; Noyes' on Intercorporate Rels., §§ 329 *et seq.*, 389; Andrews, Amer. Law (2d Ed.), Vol. I, 773.

The legislation against combinations and monopolies cannot be defeated by causing a corporation to acquire the shares or property and business of competing corporations; nor by any other scheme or device.

Corporate combinations which bring about the results denounced by the statute are unlawful. They are in fact more injurious to the public than the old forms of simple agreement among separate concerns or the well-known trust forms. Eddy on Combinations, Vol. I, §§ 617, 620 *et seq.*; Noyes on Intercorporate Relations, § 307; *Distillery Co. v. People*, 156 Illinois, 448.

If the corporate form of combination is beyond the reach of Congress, it lacks supreme power to regulate commerce. Certainly a corporation, a mere creature of state law, cannot be endowed with power to obstruct commerce not possessed by the State itself. *Deb's Case*, 158 U. S. 564; *Addyston Pipe Co. v. United States*, 175 U. S. 211; *Northern Securities Case*, 193 U. S. 197.

The right to buy, sell and transfer property is not superior to the right to make other contracts; and all are subordinate to the power of Congress to regulate commerce. *Addyston Pipe Co. v. United States*, 175 U. S. 211; *Northern Securities Co. v. United States*, 193 U. S. 197; *Swift & Co. v. United States*, 196 U. S. 396; *Shawnee Compress Co. v. Anderson*, 209 U. S. 423; *Armour Packing Co. v. United States*, 209 U. S. 56; *United States v. Del. & Hud. R. R. (Commodities Clause Case)*, 212 U. S. 366; *Natl. Harrow Co. v. Hench*, 83 Fed. Rep. 36; *S. C.*, 84 Fed Rep. 226.

A corporation which, not as an incident to orderly

growth, secures control of competitors by purchasing their shares or property and business and thereby acquires power to suppress competition is no less inimical to public interests than a technical "Trust," and indeed is often a mere modification thereof: The direct, necessary result of such an arrangement is to hinder and obstruct commerce. The *Pearsall Case*, 161 U. S. 644; *Northern Securities Case*, 193 U. S. 344; *Shawnee Compress Case*, 209 U. S. 423; *Distillery Co.* v. *People*, 156 Illinois, 448, 491. *In re Greene*, 52 Fed. Rep. 104, and the *E. C. Knight Case*, if to the contrary, must be considered disapproved.

There is no foundation for the claim that the Sherman Act was directed only against contracts and combinations of an executory nature, and is without application where transfers of property have been actually executed. It was intended to, and does, prohibit *obstructions* to commerce whether resulting from executory or executed arrangements. *Northern Securities Case*, 193 U. S. 197; *Shawnee Compress Co.* v. *Anderson*, 209 U. S. 423; *People* v. *Chicago Gas Trust*, 130 Illinois, 268; *Distillers & Cattle Feeding Co.* v. *The People*, 156 Illinois, 448; *Pocahontas Coke Co.* v. *Powhatan Coal & Coke Co.*, 60 W. Va. 508; Eddy on Combinations, § 622; Noyes on Intercorporate Relations, §§ 354, 386.

A foreign corporation doing business within the United States has no right to violate its policy or laws. An agreement or combination which in purpose or effect conflicts therewith, although actually made in a foreign country where not unlawful, gives no immunity to parties acting here in pursuance of it.

If Congress is powerless to prevent wrongs in its own jurisdiction, when the actors are foreigners, or when done in pursuance of agreements made abroad, its sovereignty is a myth.

A crime is committed within the jurisdiction where the act of the parties actually takes effect, although the in-

strumentalities may have been set in motion in another jurisdiction. *Re Palliser*, 136 U. S. 256, 265; *Horner* v. *United States*, 143 U. S. 207; *Benson* v. *Henkel*, 198 U. S. 1; *Burton* v. *United States*, 202 U. S. 344, 387; *United States* v. *Thayer*, 209 U. S. 39, 44.

The courts should enforce the anti-trust legislation by all appropriate processes known to their usages; and decrees should be so moulded as to suppress effectually the mischief consequent upon unlawful arrangements.

Congress has forbidden monopolies and combinations. When one exists everything done in furtherance of its purpose is unlawful; especially every act constituting a part of interstate or foreign commerce. Therefore the privilege of engaging therein may be denied. The power to regulate extends to prohibition of anything directly conflicting with the will of Congress lawfully expressed. *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Champion* v. *Ames* (*Lottery Case*), 188 U. S. 321; *United States* v. *D. & H. Co.*, 213 U. S. 366; *Loewe* v. *Lawlor*, 208 U. S. 274.

The statute requires the court "to prevent and restrain violations"—not merely to determine the legality of past transactions. The public interest is the thing to be subserved, and it demands the destruction of existing mischief and prevention of impending wrongs—the removal of obstruction existing or threatened.

Where an unlawful corporate combination exists and identity of constituents has been destroyed, or where one corporation has acquired a forbidden monopoly, there are two possible effective remedies. The first is to enjoin the corporation from doing interstate or foreign business until (if ever) it can affirmatively show that its affairs have been readjusted so as to render future operations lawful. The second is to appoint a receiver to take possession of the concern and by proper action restore opportunities for free competition. *Deb's Case*, 158 U. S. 564; *Chicago*,

*Rock Island &c. Ry.* v. *Union Pacific Ry.*, 47 Fed. Rep. 15, 26; *Stockton, Atty.-Genl.*, v. *Central R. R. Co.*, 50 N. J. Eq. 52, 489; *Taylor* v. *Simon*, 4 Mylne & Craig, 141; Pomeroy on Eq. Juris., 2d Ed., §§ 111, 170.

The Government established violations of the Sherman Act by proving first, the existence of contracts, combinations, conspiracies and monopolies; and, second, that the direct result or necessary tendency of these is materially to obstruct, hinder and burden the free flow of interstate and foreign commerce.

The *Knight Case* is not controlling; the combinations established here directly and materially affect not only the production and manufacture, but every department of trade and commerce in tobacco; and the results have been destruction of competition in such commerce and the creation of monopolies by defendants.

The purposes of anti-trust legislation cannot be frustrated by operating through a corporation, nor by means of executed sales and transfers of property. *The Northern Securities Co.* v. *United States*, 193 U. S. 197; *Harriman* v. *Northern Securities Co.*, 197 U. S. 244, seem decisive on this point.

Moreover, if important, the evidence clearly establishes that the defendants' actions have been characterized by duress, and unfair and oppressive methods; and that following a fixed plan they have sought to suppress competition and secure monopolies.

The decree below was right in so far as it enjoined acts in furtherance of the combination; enjoined the control of certain defendant corporations by others through stock ownership; and also in so far as it prohibited the American Tobacco Company and other defendants adjudged to be in and of themselves combinations in restraint of trade from engaging in interstate or foreign commerce.

The decree below did no more than was necessary to destroy the unlawful combinations and prevent violations

of the act—in fact it did not go far enough. Prohibition of acts in furtherance of the combination and also of control by one corporation of another is abundantly supported by *The Northern Securities Co.* v. *United States; Swift & Co.* v. *United States,* and *United States* v. *D. & H. R. R.:*

That part of the decree which adjudges the American Tobacco Company and others unlawful combinations and enjoins them from engaging in commerce is novel—apparently without a direct precedent; but it harmonizes with the duty to enforce the act. *Swift & Co.* v. *United States, supra.*

The petition should not have been dismissed as to the individual defendants.

In order effectually to destroy combinations the intelligent manipulators of corporate agencies must be reached.

Observance and every act done in pursuance of the English contracts within the United States are unlawful; and the petition was wrongfully dismissed as to the Imperial Tobacco Company, British-American Tobacco Company and domestic corporations controlled by the latter.

The effect of the agreements entered into in England between the American combination and the Imperial Tobacco Company was to suppress competition between those two great concerns both within and without the United States. The British-American Tobacco Company was brought into existence as the instrumentality for making the agreements effective. The result of the whole arrangement was to destroy competition, and inevitably tends to monopoly. Observance of these arrangements should have been prohibited. The British-American Tobacco Company should have been enjoined from doing business within the United States; and the same prohibition should have been applied to the Imperial Tobacco Company during the continuation of the unlawful contracts.

The petition should not have been dismissed as to the

United Cigar Stores Company.  This concern is one of the instrumentalities in the hands of the American Tobacco Company for carrying out its unlawful purposes, and the connection between them should have been severed.

The final decree should have adjudged that defendants were attempting to monopolize, and had monopolized, a part of interstate and foreign commerce.

Monopoly is a practical conception, and its existence must be determined in view of business conditions.  The evidence abundantly establishes that the defendants have acquired power to control prices and smother competition.

The final decree should have enjoined corporations holding shares of others from collecting dividends thereon.

This relief was granted in the *Northern Securities Case,* and is an appropriate way to destroy the relationship where one corporation improperly controls another by stock ownership.

*Mr. John G. Johnson, Mr. DeLancey Nicoll* and *Mr. Junius Parker,* with whom *Mr. William J. Wallace* and *Mr. W. W. Fuller* were on the brief, *Mr. William M. Ivins* also filing a brief, for the American Tobacco Company and all the other defendants except the Imperial Tobacco Company (of Great Britain and Ireland), Limited, United Cigar Stores Company and R. P. Richardson, Jr., & Co., Inc.:

The transactions principally complained of by the Government in this bill involve the validity of one or the other of the two following transactions, to-wit: (a) Consolidation of manufacturing interests through the formation of the corporation and the transfer to it of the properties in such manufacturing industries for exchange of stock of the vendee corporation or for cash; (b) purchase by a corporation engaged in manufacturing of the property of a competitor, or through the purchase by such corporation of whole or part of the stock of the corporation of such

competing corporation, generally for cash. These transactions are not within the operation of the Sherman Law, because they primarily affect manufacturing and not commerce. *Veazie* v. *Moor,* 14 How. 568; *County of Mobile* v. *Kimball,* 102 U. S. 691; *Coe* v. *Errol,* 116 U. S. 517; *Turpin* v. *Burgess,* 117 U. S. 504; *Kidd* v. *Pearson,* 128 U. S. 1; *In re Greene,* 52 Fed. Rep. 104; *United States* v. *Knight,* 156 U. S. 1.

The *Knight Case* was not a sporadic decision of this court, but was the logical outcome of the cases that preceded it that have just been cited, and it has not been overruled or modified by any subsequent decision, but has been expressly recognized wherever mentioned. *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Montague* v. *Lowry,* 193 U. S. 38; *Swift & Co.* v. *United States,* 196 U. S. 375; *Shawnee Compress Co.* v. *Anderson,* 209 U. S. 423; *Loewe* v. *Lawlor,* 208 U. S. 274; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 406; *Continental Wall Paper Co.* v. *Voight,* 212 U. S. 227; *Ware* v. *Mobile County,* 209 U. S. 405; *Bigelow* v. *Calumet Co.,* 167 Fed. Rep. 721. Confusion has arisen and it has been assumed that the *Knight Case* has been overruled or modified because of the failure to distinguish between the persons complained of and the transaction which is the basis of the complaint. The defendants in this case and the defendants in the *Knight Case* were engaged in interstate commerce, but the question is not whether the defendant is engaged or not in interstate commerce, but whether the transaction complained of is an act of, or direct in its effect on, interstate commerce; one engaging in interstate commerce does not thereby subject himself and his whole business to the control of Congress. *Howard* v. *Railroad Company,* 207 U. S. 463, 502.

Any attempt to distinguish this case from the *Knight Case* based upon unskillful pleading on the part of the Government in the *Knight Case,* is defeated by a consider-

ation of the record of that case on file in this court. The scope of the *Knight Case* as here contended has been assumed by the law department of the Government from 1895 to 1907. Annual Reports of the Attorney General 1895, p. 13; for 1896, p. xxvii; for 1899, pp. 21 *et seq.;* for 1906, p. 7; Senate Document No. 687, 2d Session, 60th Congress, p. 27. Upon the decision in the *Knight Case,* the defendants—and these defendants are only one among many in this respect—have proceeded; this adjudication of this court has become a rule of property, and to overrule it would make wrecks of these enterprises; a case of such close analogy to *ex post facto* laws is presented that the maxim of *stare decisis* becomes almost as if embodied in the Constitution itself. It is as important that the law should be settled permanently as that it should be settled correctly. *Gilbert* v. *Philadelphia,* 3 Wall. 713, 724; *Vale* v. *Arizona,* 207 U. S. 201, 205.

Without reference to whether the trade is interstate, the transactions shown by this record do not constitute contracts, combinations or conspiracies in restraint of trade, and are not against the public policy which this court has (*Northern Securities Case, supra*) declared to be the purpose and effect of the Sherman Law. The intent of Congress was not to unsettle legitimate business enterprises, but rather to place a statutory prohibition, with prescribed penalties and remedies, upon those contracts which were in direct restraint of trade, unreasonable, and against public policy. (Mr. Justice Brewer in *Northern Securities Case*). The transfer of property by purchase, sale, or consolidation, whether by the formation of partnerships, organization of corporations, or consolidation of preëxisting corporations, is not violative of the common law. See *Fairbanks* v. *Leary,* 40 Wisconsin, 637; *People* v. *North River Sugar Refining Co.,* 121 N. Y. 583; *Trenton Potteries Co.* v. *Oliphant,* 58 N. J. Eq. 507; *Cameron* v. *Water Co.* (N. Y.), 62 Hun, 269; *Vinegar Co.* v. *Foehrenback,* 148 N. Y.

58; *Dittman* v. *Distilling Co.*, 64 N. J. Eq. 544; *Commonwealth* v. *Hunt*, 4 Metc. 111; *Oakdale Co.* v. *Garst*, 18 R. I. 484; *McCauley* v. *Tierney*, 19 R. I. 225; *Bohn Co.* v. *Northwestern Assn.*, 54 Minnesota, 223; *Monongahela Co.* v. *Jutte*, 210 Pa. St. 288, 300. Such transfer and consolidation is not opposed to the public policy, but is expressly authorized and facilitated by the merger statutes of many States, and is forbidden by the statutes of none. Many of the States which authorize the merger of corporations have anti-trust statutes of the same general import as the Sherman Anti-Trust Law, and to give to the Federal Anti-Trust statute the meaning contended for by the Government and to import that meaning into the various state anti-trust statutes would work the incongruity of assuming that the States had facilitated the formation of corporations, which by their very formation would become outlaws of commerce.

The decision of this court in *Northern Securities Case* is not in conflict with the contention here made; this court in the *Northern Securities Case* did not overrule or modify the declarations theretofore made, and in subsequent decisions has not recognized the *Northern Securities Case* as in conflict with the contention here made. *Trans-Missouri Freight Assn. Case*, 166 U. S. 290; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505; *Smiley* v. *Kansas*, 196 U. S. 447; *National Cotton Oil Co.* v. *Texas*, 197 U. S. 115; *Cincinnati Packing Co.* v. *Bay*, 200 U. S. 179; *Chesapeake & Ohio Co.* v. *United States*, 115 Fed. Rep. 610, 620; *Davis* v. *Booth*, 131 Fed. Rep. 31, 37; *Robinson* v. *Brick Co.*, 127 Fed. Rep. 804; *Connor-McConnell Co.* v. *McConnell*, 140 Fed. Rep. 412; aff., *idem*, 987; *Fisheries Co.* v. *Lennen*, 116 Fed. Rep. 217; *Harrison* v. *Glucose Co.*, 116 Fed. Rep. 304; *National Co.* v. *Haberman*, 120 Fed. Rep. 415; *Bigelow* v. *Calumet Co.*, 167 Fed. Rep. 721. The combinations and contracts in existence at the passage of the Sherman Law, and in the contemplation of Congress in its enactment,

were entirely distinct from those combinations of capital and ability which had long existed in the form of joint-stock associations or corporations or partnerships, and it is the duty of the court to apply the Sherman Law as an evolutionary statute, and not assume a revolutionary purpose in the mind of Congress in its enactment.

These defendants have not violated the Sherman Law by monopolizing trade or commerce, although they in the aggregate enjoy large, but varying, proportions of the business in the products of tobacco. Monopolizing under the Sherman Law is an activity and not a state of being, and size, and the power that is inherent in size, whether size be considered in relation to investment or to the proportion of business at the time enjoyed, is not monopolizing or an element of monopolizing. Monopoly at common law was a license or privilege for the sole buying and selling, making, working, or using of anything whatsoever, whereby the subject in general is restrained from that liberty in manufacturing or trading which he had before. 4 Blackstone, 159. Monopolizing under the statute carries with it the idea of exclusion, and whatever the magnitude of a concern may be, it is not guilty of monopolizing or attempting to monopolize unless it is doing something by which there is either attained or attempted this result, to-wit, that "the subject in general is restrained from that liberty of trading which he had before." See dissenting opinion of Mr. Justice Holmes in *Northern Securities Case,* 193 U. S. 409; *In re Greene,* 52 Fed. Rep. 115; *Chemical Co.* v. *Providence Co.,* 64 Fed. Rep. 946, 949; *Whitwell* v. *Continental Tob. Co.,* 125 Fed. Rep. 462; *United States* v. *Reading Co.,* 183 Fed. Rep. 427. This is true not only with respect to this statute, but it is so recognized at common law and among economic writers. *Mogul Co.* v. *McGregor,* L. R. 23 Q. B. 598, 618; *Oakdale* v. *Garst,* 18 R. I. 484; Prof. Ely's "Monopolies and Trusts," 34; Clark's Control of Trusts, 6.

These defendants have not, either singly or in combination, excluded or attempted to exclude anyone from trade and commerce. (a) They have not cornered nor attempted to corner the supply of raw material; it is a matter of serious doubt whether such corner or attempting to corner would fall within the inhibition of the Sherman Law, or within the constitutional power of Congress, as being an act of, or direct in its effect on, interstate commerce, even if the record disclosed it. But decisions as to those questions are not necessary to an adjudication of this case. (b) Defendants have not enjoyed rebates or other preference in transportation; (c) they have not enjoyed exclusive advantage in the use of machinery and facilities for manufacturing; (d) they have not excluded nor attempted to exclude competitors from the avenues of distribution—marketing their products. It is impossible to conceive of exclusion or attempt to exclude competitors from trade that does not involve one or the other of the foregoing methods or avenues. The defendants have met active competition, and in meeting it have adopted the ordinary methods of competition. To give a construction to the Sherman Law, intended as it is to foster competition, that would forbid the usual methods of competition, would make the statute self-destructive. Competition, it is often said, is the life of trade, but the object of all competition is to drive out other competitors. To say that a man is to trade freely, but that he is to stop short of any act which is calculated to harm other tradesmen and which is designed to attract business to his own shop would be a strange and impossible counsel of perfection. The rights of competitors are different from the rights of strangers to the trade, and conduct is justified on the part of the person or corporation who seeks to build his own business that would be unlawful if adopted by him whose only motive was the injury of another. *Loewe* v. *Lawlor, supra; Bonsack Machine Co.* v. *Smith,* 70 Fed. Rep. 383, 388;

*Mogul Co.* v. *McGregor,* L. R. 23 Q. B. 598, 618; *Berry* v. *Donovan,* 188 Massachusetts, 353; *Barnes* v. *Typographical Union,* 232 Illinois, 424; *Barr* v. *Essex Trades Council,* 53 N. J. Eq. 101, 124; *Doremus* v. *Hennessey,* 176 Illinois, 608; *Whitwell* v. *Continental Tob. Co., supra.* The rights of competitors as recognized · at common law include the right to undersell competitors; *Commonwealth* v. *Hunt* (Mass.), 4 Metc. 111, 134; *Lough* v. *Outerbridge,* 143 N. Y. 271, 283; to have secret partners; 1 Lindley on Part. (2d Am. Ed.) * 16; *Winship* v. *Bank,* 5 Peters, 529, 562; to adopt a policy of business that can only result in destruction of weak competitors, even though a part of it is the sale of goods below cost; *Lough* v. *Outerbridge,* 143 N. Y. 271, 283; *Martel* v. *White,* 185 Massachusetts, 255; *Lewis* v. *Lumber Co.,* 121 Louisiana, 658; *Karges Co.* v. *Amalgamated Union,* 165 Indiana, 421; to make provision for exclusive handling; *Palmer* v. *Stebbins* (Mass.), 3 Pick. 188, 192; *In re Greene, supra; Whitwell* v. *Continental Tob. Co., supra; Houch* v. *Wright,* 77 Mississippi, 476.

Purchasers of competing businesses do not constitute attempts to monopolize, for such purchases do not exclude others from the trade, but leave the field open; this is true, although the inducement to purchase is to get rid of a competitor. The law of self-defense and protection applies to one's business as well as to his person. *United Shoe Co.* v. *Kimball,* 193 Massachusetts, 351; *Wood* v. *Whitehead Bros. Co.,* 165 N. Y. 545, 551; *United States Co.* v. *Provident Co.,* 64 Fed. Rep. 946, 950; *Butt* v. *Ebel,* 29 N. Y. App. Div. 256, 259; *Lanyon* v. *Garden City Sand Co.,* 223 Illinois, 616; *National Co.* v. *Cream City Co.,* 86 Wisconsin, 352. Covenants taken from a vendor not to engage in a business in competition with that sold are not only not criminal, but are altogether valid and enforceable. *Cincinnati Co.* v. *Bay,* 200 U. S. 179; *Fowle* v. *Park,* 131 U. S. 88; *Navigation Co.* v. *Winsor,* 20 Wall. 64; *Electric Co.* v. *Hawks,* 171 Massachusetts, 101.

The Sherman Law properly construed and applied is a beneficent and evolutionary statute, whose purpose and effect is to preserve to every one liberty and opportunity to engage in interstate commerce—it preserves this liberty and opportunity as against the unreasonable covenants and contracts of the party himself, as well as against the tortious conduct of others, whether those others seek in combination to exclude a stranger to the combination, or seek singly to exclude him. In other words, this statute applies to interstate trade the doctrines of the common law applicable to trade and commerce, without respect to whether interstate or not, and the words used in it are well known words at common law, which must, in the interpretation of this law, be given their common law meaning. The chief purpose of the statute was to make certain the application in the Federal jurisdiction of the principles of the common law, and to provide definite and certain remedies for the enforcement thereof.

In addition to the considerations heretofore mentioned, this construction, and this construction alone, gives meaning and effect to every word of the statute: (a) The first section of the statute condemns *every* contract, etc., in restraint of trade—the construction contended for by the Government in this case would eliminate the word "every" from the statute and makes the test dependent not upon the nature of the act, but its magnitude or result; these defendants contend that it is the nature of the act that is the test and that *every* transaction of the prohibited nature is forbidden, whatever its magnitude, result, or intent; (b) the second section forbids the monopolizing or attempt to monopolize of *any part* of interstate trade or commerce—the Government's contention as to the meaning of this second section eliminates these words from the statute or substitutes for them the words "in *large* part," or "*a dominating* part"; the construction contended for by these defendants gives full force to the mean-

ing "any part"—it is a violation of the statute to exclude
or attempt to exclude by tortious means a trader from
even the smallest part of interstate trade or commerce.
An additional argument in favor of the construction of
the statute here contended for is seen when the remedy is
considered. The court below, construing the statute as
contended for by the Government, said that it condemned
that incidental elimination of competition which comes
from ordinary consolidation, sale, and purchase; in order
to give vitality to such construction there are involved
two grave constitutional questions: First: Is there a con-
stitutional power in Congress to forbid the ordinary trans-
actions that have characterized all commercial peoples,
and that are unquestionably valid at common law? Sec-
ond: Has Congress the constitutional power to prevent a
state corporation from engaging in interstate commerce
in wholesome products? These defendants believe that
these two questions should be each answered in the nega-
tive; Congress has no right under its authority to regulate
commerce, great and paramount as that power is, to
violate the fundamental rights secured by other provisions
of the Constitution. *Monongahela Co.* v. *United States*,
148 U. S. 312, 336; *Adair* v. *United States*, 208 U. S. 161,
180; *Allgeyer Case*, 165 U. S. 578, 589, 591. Congress has
not a right to forbid corporations or natural persons from
engaging in interstate commerce in wholesome products—
the right of intercourse between State and State derives
its source from those laws whose authority is acknowledged
by civilized man throughout the world—the Constitution
found it an existing right and gave to Congress only the
power to regulate it. *Gibbons* v. *Ogden*, 9 Wheat. 1, 211;
*Paul* v. *Virginia*, 8 Wall. 168. Corporations have this
right as certainly and as thoroughly as natural persons.
*Santa Clara County* v. *R. R.*, 118 U. S. 394, 396; Justice
Field at Circuit in *Railroad Tax Cases*, 13 Fed. Rep. 722,
746; *Hale* v. *Henkel*, 201 U. S. 43, 76, 85. The *Lottery*

*Case,* 188 U. S. 321, is not in conflict with this contention, because it was based on the inherent vicious nature of the commodity involved, to-wit, lottery tickets.

It is well settled that if a statute be susceptible of two interpretations, by one of which it would be unconstitutional or of doubtful constitutional validity, and by the other valid, the latter construction should be adopted. *Commodities Case,* 213 U. S. 366. The court below, however, having construed the Sherman Anti-Trust Law as forbidding the elimination of competition that results incidentally from sale, purchase and consolidation, resolved these two grave constitutional questions against the defendants, and, under the language of a statute which authorizes a court to restrain and enjoin only "violations of the Act," restrained and enjoined the assumed violators of the act from all interstate activity. It is practicable for a court to "prevent and restrain" the making or the continued operation of an executory contract or conspiracy, or combination in the nature of a contract or conspiracy; and it is practicable for a court to prevent and restrain a practice which involves monopolizing trade—tortiously excluding or attempting to exclude strangers to the scheme contemplated; these are the things condemned by the Sherman Law; it is not practicable nor constitutional to prevent or restrain the purchaser of private property from the use of his property, or penalize such use by preventing his engaging in interstate commerce in wholesome articles. The impracticability of constitutional remedy demonstrates the unsoundness of the construction of the act contended for by the Government.

*Mr. William B. Hornblower,* with whom *Mr. John Pickrell, Mr. William W. Miller,* and *Mr. Morgan M. Mann,* were on the brief for appellee, the Imperial Tobacco Company:

By far the greater part of the testimony taken in this

cause has to do with the alleged combinations entered into by the American Tobacco Company and its allied companies in this country, with which the Imperial Company and the British-American Company have no concern. It is claimed, however, by the Government that certain contracts entered into by the Imperial Company in 1902 with the American Company were in violation of the Sherman Act, and that the transactions of the Imperial Company since that date have been in violation of the act. These contracts were entered into in England in the summer of 1902 for the purpose of putting an end to the ruinous competition which was being carried on in England by the Ogdens Limited owned by the American Company.

The court below was right in dismissing the bill as to the Imperial Company and as to the British-American Tobacco Company, on the ground that those companies were British companies, that the contracts to which they were parties were made in Great Britain and were valid under the laws of Great Britain, and that the Sherman Anti-Trust Act has no extraterritorial effect. *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347.

The agreements of September 27, 1902, between the American Tobacco Company and the Imperial Tobacco Company were not in violation of the Sherman Anti-Trust Act. So far as those agreements operated to restrain trade in Great Britain or between Great Britain and countries other than the United States, they are not within the prohibition of the Sherman Act. So far as they operate to restrain trade between England and this country, or between the various States of this country, such restraint is merely incidental to the sale of certain plants and good will, and is not within the prohibition of the Sherman Act.

The principle that there are certain contracts in partial restraint of trade which would not be invalid at common law, and which do not come within the prohibition of the Sherman Act, has been recognized by this court in the

very cases which are cited by the Government as holding that all contracts in restraint of trade whether reasonable or unreasonable, are in violation of the Sherman Act. See *United States* v. *Trans-Missouri Freight Association.* 166 U. S. 290, 329. The same principle is recognized in *United States* v. *Joint Traffic Association,* 171 U. S. 505, 566; *Northern Securities Co.* v. *United States,* 193 U. S. 197, per Mr. Justice Brewer at p. 361; *Cincinnati Packet Co.* v. *Bay,* 200 U. S. 179, per Mr. Justice Holmes at p. 184.

Mr. Justice Peckham in the *Joint Traffic Case* held that the statute is to have a "reasonable construction." When he states that contracts in restraint of trade are invalid under the statute, whether reasonable or unreasonable, he refers not to contracts between mercantile or manufacturing concerns, but to contracts or combinations between competing railroad corporations, all of which contracts or combinations are illegal under the statute even though the rates and fares established are reasonable. See 171 U. S. 568, 570.

The distinction between contracts affecting public service corporations, and contracts between private individuals or corporations, is well stated in *Gibbs* v. *Baltimore Gas Co.,* 130 U. S. 396, where it was held that a corporation cannot disable itself by contract from the performance of public duties which it has undertaken, and thereby make public accommodation or convenience subservient to its private interests, but where the public welfare is not involved, and where the restraint of one party is not greater than protection to the other party requires, the contract in restraint of trade may be sustained.

The validity of covenants between vendor and vendee, for the purpose of protecting the covenantee in the enjoyment of the legitimate fruits of the contract, have been upheld under the Sherman Act in the *Addyston Pipe Case,* 85 Fed. Rep. 291, modified and affirmed without approval of the opinion below in 175 U. S. 211; *Brett* v.

*Ebel,* 29 N. Y. App. Div. 256; *Lanyon v. Garden City Sand Co.,* 223 Illinois, 616; *Whitwell v. Continental Tobacco Co.,* 125 Fed. Rep. 454; *Bancroft & Rich v. U. S. Embossing Co.,* 72 N. H. 402; *Harbison-Walker Refractories Co. v. Stanton,* 227 Pa. St. 55.

In view of the statement of Mr. Justice Brewer in his concurring opinion in the *Northern Securities Case,* 193 U. S. 361, that "Congress did not intend to reach and destroy those minor contracts in partial restraint of trade," and in view of the limitations placed upon the effect of the statute in Mr. Justice Peckham's opinion in the *Trans-Missouri Case,* we may fairly assume the statement made by Mr. Justice Brewer to represent the views of this court, especially as to contracts of a mercantile character not affecting railroads or other direct instruments of commerce. The subject of contracts not in restraint of trade at common law prior to the act of 1890 is discussed by this court in *Oregon Steam Navigation Co. v. Winsor,* 20 Wall. 64; *Gibbs v. Consolidated Gas Co.,* 130 U. S. 396, 409; *Fowles v. Park,* 131 U. S. 88–96.

The lower Federal courts have decided numerous cases both before and since the Sherman Act, upholding contracts, the avowed object of which was to buy off competition of a business rival. *Carter v. Alling,* 43 Fed. Rep. 208; *U. S. Chemical Co. v. Provident Chemical Co.,* 64 Fed. Rep. 946; *Harrison v. Glucose Sugar Refining Co.,* 116 Fed. Rep. 304; *National Enameling & Stamping Co. v. Haberman,* 120 Fed. Rep. 415; *Praine v. Ferrell,* 166 Fed. Rep. 702; *Walker v. Lawrence,* 177 Fed. Rep. 363.

Contracts between parties which have for their object the removal of a rival competitor in a business are not to be regarded as contracts in restraint of trade. Contracts although in partial restraint of trade, if valid at common law, and if not a cover for a combination or conspiracy to raise prices, or to prevent general competition, are not invalid under the Sherman Act. This proposition

is clearly held by the authorities above cited from the Federal reports.

As to what contracts would not be illegal at common law as in restraint of trade, see *Rousillon* v. *Rousillon*, 14 Ch. Div. 351; *Leather Cloth Co.* v. *Lorsent*, L. R. 9 Eq. 345; approved by this court in *Gibbs* v. *Consolidated Gas Co.*, 130 U. S. 396.

In *Nordenfelt* v. *Maxim, Nordenfelt Guns and Ammunition Co.*, L. R. 1894, App. Cases, 535, the House of Lords reviewed at great length and in elaborate opinions the whole subject of covenants in restraint of trade, and held unanimously that a covenant, though unrestricted as to space, was not invalid where it was shown to be no wider than was necessary for the protection of the company, nor injurious to the public interests.

The case of *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473, establishes the proposition that in connection with the sale of a factory and the good will thereof, a covenant, practically unrestricted in time or space, not to engage in the manufacture or sale of competing articles, is not a covenant in restraint of trade. The same principle is laid down in the cases of *Hodge* v. *Sloane*, 107 N. Y. 244; *Leslie* v. *Lorillard*, 110 N. Y. 519; *Tode* v. *Gross*, 127 N. Y. 480; *Matthews* v. *Associated Press*, 136 N. Y. 333; *Oakes* v. *Cataragus Water Co.*, 143 N. Y. 430; *Wood* v. *Whitehead Brothers Co.*, 165 N. Y. 545; *New York Bank Note Co.* v. *Hamilton Bank Note Co.*, 180 N. Y. 280; *Anchor Electric Co.* v. *Hawkes*, 171 Massachusetts, 101; *United Shoe Machinery Co.* v. *Kimball*, 193 Massachusetts, 351; *Rakestraw* v. *Lanier*, 104 Georgia, 188; *Bullock* v. *Johnson*, 110 Georgia, 486.

The most recent decisions in the state courts in which covenants to refrain from competition have been held reasonable and lawful, are, *Freudenthal* v. *Espey* (Cal.), 102 Pac. Rep. 280; *Louisville Board of Underwriters* v. *Johnson* (Ky.), 119 S. W. Rep. 152; *Wolf* v. *Duluth Board of Trade*

(Minn.), 121 N. W. Rep. 395; *Seigal* v. *Marcus*, (No. Dak.), 119 N. W. Rep. 358; *Buckhout* v. *Witler* (Mich.), 122 N. W. Rep. 184; *Blume* v. *Home Ins. Agency* (Ark.), 121 S. W. Rep. 293; *Wooten* v. *Harris* (No. Car.), 68 S. E. Rep. 989; *Home Telephone Co.* v. *North Manchester Telephone Co.* (Ind.), 92 N. E. Rep. 558; *Artistic Porcelain Co.* v. *Boch* (N. J.), 74 Atl. Rep. 680; *Harbison-Walker Refractories Co.* v. *Stanton* (Pa.), 75 Atl. Rep. 988.

As to the British-American agreement there is absolutely nothing in that agreement which prevents, or tends to prevent, any other company or companies from manufacturing and exporting tobacco to other countries than Great Britain and the United States. There is no agreement to restrict prices or to interfere in any way with free competition. The evidence shows that there has been no actual diminution in the business of exporting either leaf tobacco or manufactured tobacco from the United States to foreign countries by reason of the British-American agreement.

None of the decisions heretofore made by this court under the Sherman Act are applicable to the agreements here involved. The *Joint Traffic, Trans-Missouri* and *Northern Securities* cases dealt with agreements between railroad companies or holders of railroad stocks, the effect and intent of which were held to restrict competition between common carriers and public service corporations. They have no application to agreements between manufacturers, but are based upon the peculiar obligations of common carriers and public service corporations. The *Addyston Pipe Case*, 175 U. S. 211, involved an agreement between rival and competing manufacturers that there should be no competition between them in certain States or Territories, the direct, immediate and intended effect of which agreement was the enhancement of the price.

*Montague* v. *Lowry*, 193 U. S. 38, was an agreement, the effect of which was to raise prices in the California market.

The case of *Swift & Co.* v. *United States* involved a combination of independent meat dealers who agreed not to bid against each other in the livestock markets, to fix selling prices and to restrict shipments of meat when necessary.

The case of *Chattanooga Foundry* v. *Atlanta*, 203 U. S. 390, was a sequel of the *Addyston Pipe Case*.

The case of *Shawnee Compress Co.* v. *Anderson*, 209 U. S. 423, was a case where the lessor company had agreed with the lessee company not only to go out of the field of competition, and not to enter that field again, but had further agreed to render every assistance to prevent others from entering it.

The case of *Continental Wall Paper Co.* v. *Voight Sons*, 212 U. S. 227, was a case of an agreement between a number of manufacturers who organized a selling company through which their entire output was sold to such persons only as would enter into a purchasing agreement by which their sales were restricted. The agreement provided for selling by jobbers at particular specified prices. The company was a selling company organized to control all the selling business of the manufacturing wall paper corporations, partnerships and persons who owned the stock of the Continental Wall Paper Company, and made separate contracts with that corporation giving it entire control of the selling business of the manufacturers.

None of the cases in this court apply to the agreements between the American and Imperial Companies, which are involved in this suit. They had no necessary effect to directly and substantially restrict free competition in any of the products of tobacco, and did not unlawfully restrain interstate commerce. *Whitwell* v. *Continental Tobacco Co.*, 125 Fed. Rep. 461.

The oral testimony shows that the agreements did not and could not, under the existing circumstances, operate to restrain trade or create a monopoly, and therefore could

not, and did not operate as a violation of the Sherman Anti-trust Act. It appears from the testimony that at the time of the agreements, there was practically no exportation or importation of manufactured products between Great Britain and the United States, owing to the protective duties in this country and the differentials imposed upon imported goods in Great Britain. It was not possible to sell manufactured tobacco imported into this country in competition with the domestic articles of manufacture, nor was it possible to export to England and sell in competition with domestic manufacture.

So far as the bill of complaint herein avers, that there was any restraint of competition in the purchase of leaf tobacco, the evidence overwhelmingly disproves any such claim. There was no agreement, arrangement or understanding between the American Tobacco Company and the Imperial or its representatives, to refrain from active competition in the purchase of leaf tobacco. The testimony shows without any contradiction that there has been at all times active competition between the Imperial Company's agents and the agents of the American Company, and of the independent concerns, and of the "Rigi" countries in the purchase of leaf tobacco, and the testimony shows that the price of leaf tobacco has increased since the agreements between the Imperial and American Company were made, and is still increasing. The amount of the consumption of leaf tobacco and the prices paid for it have both increased since 1902 up to the present time.

No decree can be made in this suit as against the Imperial Company which will be just and equitable.

There are three possible evils aimed at by the Sherman Anti-trust Act. First, the raising of the price of the commodity to consumers; second; the lowering of the price of raw material to producers; third, the crushing out of competitors. There is no evidence in the case at bar that the agreements between the Imperial Company and the

American Company which are attacked in this suit, have resulted in any one of these three evils.

There is no evidence that the price of tobacco products in any of their forms, has been raised to the consumer. So far as appears, the price has remained the same.

There is no evidence that the price to the producers of leaf tobacco has been reduced. On the contrary, the evidence is uncontradicted that the price has steadily increased.

There is no evidence that any competitor has been in any way interfered with by reason of the agreements between the Imperial Company and the American Company. Every manufacturer in the United States has been at liberty to manufacture and export his goods without hindrance on the part of either the Imperial or the American Company, or the British-American or any of the other defendants in this case. The agreements in this suit do not undertake to fix prices or to pool profits, or to eliminate competition in any way, or to interfere with the ordinary laws of supply and demand.

*Mr. Sol M. Stroock* for the United Cigar Stores Company:

The company has not violated any of the provisions of § 1 of the Sherman Anti-trust Act. It has not made any contract, nor engaged in any combination or conspiracy restraining the interstate commerce of the other defendants or any of them; or restraining its own interstate commerce; or restraining the interstate commerce of any competitor of the other defendants, or any of them; or restraining the interstate commerce of any competitor with it.

The United Cigar Stores Company has not violated any of the provisions of § 2 of the Sherman Anti-trust Act. It has not secured nor attempted to secure a monopoly for any of the other defendants nor combined

with any of the other defendants to exclude others from the field of competition with them.

It has not secured nor attempted to secure a monopoly of the retail trade for itself, nor attempted, either alone or in combination or conspiracy with the other defendants, to exclude others from the field of competition with it.

The United Cigar Stores Company has not, as an incident of obtaining a monopoly, or as part of any combination in restraint of trade, prevented vendors from engaging in the business of handling and dealing in tobacco products.

*Mr. Charles R. Carruth, Mr. Charles J. McDermott, Mr. C. B. Watson, Mr. James T. Morehead* and *Mr. A. J. Burton* for R. P. Richardson, Jr., & Company, Inc., appellee, submitted.

*Mr. W. Bourke Cockran,* by leave of the court, submitted a brief as *amicus curiæ.*

*Mr. Thomas Thacher* and *Mr. J. Parker Kirlin,* by leave of the court, submitted a brief as *amici curiæ* on certain questions common to this case and other pending causes.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

This suit was commenced on July 19, 1907, by the United States, to prevent the continuance of alleged violations of the first and second sections of the Anti-trust Act of July 2, 1890. The defendants were twenty-nine individuals, named in the margin,[1] sixty-five American

---

[1] James B. Duke, Caleb C. Dula, Percival S. Hill, George Arents, Paul Brown, Robert B. Dula, George A. Helme, Robert D. Lewis, Thomas J. Maloney, Oliver H. Payne, Thomas F. Ryan, Robert K. Smith, George W. Watts, George G. Allen, John B. Cobb, William R. Harris, William H. McAlister, Anthony N. Brady, Benjamin N. Duke,

corporations, most of them created in the State of New Jersey, and two English corporations. For convenience of statement we classify the corporate defendants, exclusive of the two foreign ones, which we shall hereafter separately refer to, as follows: The American Tobacco Company, a New Jersey corporation, because of its dominant relation to the subject-matter of the controversy as the primary defendant; five other New Jersey corporations (viz., American Snuff Company, American Cigar Company, American Stogie Company, MacAndrews & Forbes Company, and Conley Foil Company), because of their relation to the controversy as the accessory, and the fifty-nine other American corporations as the subsidiary defendants.

The ground of complaint against the American Tobacco Company rested not alone upon the nature and character of that corporation and the power which it exerted directly over the five accessory corporations and some of the subsidiary corporations by stock ownership in such corporations, but also upon the control which it exercised over the subsidiary companies by virtue of stock held in said companies by the accessory companies by stock ownership in which the American Tobacco Company exerted its power of control. The accessory companies were impleaded either because of their nature and character or because of the power exerted over them through stock ownership by the American Tobacco Company and also because of the power which they in turn exerted by stock ownership over the subsidiary corporations, and finally the subsidiary corporations were impleaded either because of their nature or because of the control to which they were subjected in and by virtue of the stock ownership above stated. We append in the margin a statement showing

H. M. Hanna, Herbert D. Kingsbury, Pierre Lorillard, Rufus L. Patterson, Frank H. Ray, Grant B. Schley, Charles N. Strotz, Peter A. B. Widener, Welford C. Reed (now deceased), and Williamson W. Fuller.

the stock control exercised by the principal defendant, the American Tobacco Company, over the five accessory corporations and also the authority which it directly exercised over certain of the subsidiary corporations, and a list showing the control exercised over the subsidiary corporations as a result of the stock ownership in the accessory corporations, they being in turn controlled as we have said by the principal defendant, the American Tobacco Company.[1]

---

[1] Extent of control of American Tobacco Company over the accessory corporations:

*American Snuff Company*—of 120,000 shares of preferred stock owns 12,517 shares directly and 11,274 shares by reason of stock control of P. Lorillard Co., in all 23,764 shares; of 110,017 shares of common stock owns 41,214 directly and 34,594 by reason of stock control of P. Lorillard Co., in all 75,808 shares.

*American Cigar Company*—of 100,000 shares of preferred stock owns 89,700 shares directly and 5,000 shares through control of American Snuff Co., in all 94,700 shares; of 100,000 shares of common stock owns directly 77,451 shares.

*American Stogie Company*—of 108,790 shares of common stock controls 73,072¾ shares through stock interest in American Snuff Company. The American Stogie Company owns all of the stock— 12,500—of the Union American Cigar Company—cigars and stogies.

*MacAndrews & Forbes Company*—of 37,585 shares of preferred stock (no voting power) owns 7,500 shares; of 30,000 shares of common stock owns 21,129 shares directly and 983 shares through stock control of the R. J. Reynolds Co., in all 22,112 shares.

*The Conley Foil Company*—of 8,250 shares of stock, directly owns 4,950 shares.

*The American Tobacco Company*—by stock ownership is the owner outright of the following defendant companies:

S. Anargyros [The S. Anargyros Company owns all the capital stock (10 shares) of the London Cigarette Co.]; F. F. Adams Tobacco Co.; Blackwell's Durham Tobacco Co.; Crescent Cigar and Tobacco Co.; Day and Night Tobacco Co.; Luhrman & Wilbern Tobacco Co.; Nall & Williams Tobacco Co.; Nashville Tobacco Works; R. A. Patterson Tobacco Co.; Monopol Tobacco Works; Spalding & Merrick.

The two foreign corporations were impleaded either because of their nature and character and the operation and effect of contracts or agreements with the American To-

---

The American Tobacco Co. also has the stock interest indicated in the following defendant corporations:

British-American Tobacco Co.—owns 1,200,000 shares of 1,500,000 shares of preferred stock and 2,280,012 shares of 3,720,021 shares of common stock.

The Imperial Tobacco Co., &c.—owns 721,457 pounds sterling of 18,000,000 pounds sterling of stock.

The John Bollman Co.—of 2,000 shares of stock owns 1,020 shares.

F. R. Penn Tobacco Co.—of 1,503 shares of stock owns 1,002 shares (through Blackwell's Durham Tobacco Co.).

R. P. Richardson, Jr., & Co., Inc.—owns 600 out of 1,000 shares of stock and $120,000 of $200,000 issue of bonds.

R. J. Reynolds Tobacco Co.—owns 50,000 out of 75,250 shares of stock.

Pinkerton Tobacco Co.—owns 775 out of 1,000 shares of stock.

Reynolds Tobacco Co. (of Bristol, Tenn.)—owns 1,449 shares out of 2,500 shares.

J. W. Carroll Tobacco Co.—owns 2,000 out of 3,000 shares.

P. Lorillard Co.—owns 15,813 out of 20,000 shares of preferred and all the common stock (30,000 shares).

Kentucky Tobacco Product Co.—owns 14 of 1,900 shares preferred and owns directly 5,264, and, through the American Cigar Co., 355 out of 8,100 shares of common stock. [The Kentucky Tobacco Product Co. owns all the capital stock (100 shares) of the Kentucky Tobacco Extract Co.]

Porto Rican-American Tobacco Co.—owns directly 6,578, and, through the American Cigar Co., 6,576 of 19,984 shares of stock. [The Porto Rican-American Tobacco Co. owns 190 of the 380 shares of preferred and 300 of the 450 shares of common stock of Ind. Co. of Porto Rico; also owns 2,150 of the 5,000 shares of capital stock of the Porto Rico Leaf Tobacco Co.]

---

The American Tobacco Company is also interested, as indicated, in the following defendants, supply or machinery companies:

Golden Belt Manufacturing Co. (cotton bags)—owns 6,521 of 7,000 shares.

Mengel Box Co. (wooden boxes)—British-American Tobacco Co. owns 3,637 of 5,000 shares of stock.

[The Mengel Company owns all of the capital stock of the Columbia

bacco Company, or the power which it exerted over their affairs by stock ownership.

As we shall have occasion hereafter in referring to mat-

Box Company and of the Tyler Box Company, respectively 1,500 and 250 shares.]

Amsterdam Supply Co.—(agency to purchase supplies)—owns majority of stock and controls large part of remainder through subsidiary companies.

Thomas Cusack Co.—(bill posting)—owns 1,000 out of 1,500 shares.

Manhattan Briar Pipe Co.—owns all of stock, 3,500 shares.

International Cigar Machinery Co.—of 100,000 shares owns 33,637 shares directly and 29,902 shares through Am. Cigar Co.—in all 63,539 shares.

The American Tobacco Company is also interested in the following companies, not named as defendants:

American Machine & Foundry Co.—owns 510 shares directly and remainder (490) through Am. Cigar Co.

New Jersey Machine Co.—owns 510 shares directly and remainder (490) through Am. Cigar Co. .

Standard Tobacco Stemmer Co.—of 17,300 shares owns 16,895 shares.

Garson Vending Machine Co.—of 500 shares owns 250 shares.

The American Snuff Company in addition to stock, etc., interests in the American Tobacco Co., American Cigar Company, and the Amsterdam Supply Company, has stock interests in the following defendants:

H. Bolander—owns all of stock, 1,350 shares;

De Voe Snuff Co.—owns all of stock, 500 shares. [The De Voe Snuff Co. owns all the capital stock, 400 shares of Skinner & Co., snuff.]

Standard Snuff Co.—owns all of stock, 2,816 shares.

The American Cigar Co. in addition to stock interests in the Amsterdam Supply Co., American Stogie Co., Porto Rican-American Tobacco Co., Kentucky Tobacco Product Co. and International Cigar Machinery Co., has the stock interest indicated in the following defendants:

R. D. Burnett Cigar Co.—owns 77 out of 150 shares;

M. Blaskower Co.—owns 1,875 out of 2,500 shares pref. and 1,875 out of 2,500 shares of common.

ters beyond dispute to set forth the main facts relied upon by the United States as giving rise to the cause of action alleged against all of the defendants it suffices at this

Cuban Land & Leaf Tobacco Co.—owns all of stock, 1,000 shares.
    [The Cuban Land, &c., Co. owns 1,320 of the 1,890 shares of stock of the Vuelta Abajo S. S. Co.]
Cliff Weil Cigar Co.—owns 255 out of 500 shares.
Dusel, Goodloe & Co.—owns 510 out of 750 shares.
Federal Cigar Real Estate Co.—owns all stock, 6,000 shares.
J. J. Goodrum Tobacco Co.—owns 477 out of 600 shares.
Havana-American Co.—owns all stock, 2,500 shares.
Havana Tobacco Co.—owns 700 shares out of 47,038 preferred, 166,800 out of 297,912 common stock, and $3,500,000 of $7,500,000 bonds.
Jordan Gibson & Baum Co., Inc.—owns all preferred and common stock, 250 shares each.
Louisiana Tobacco Co., Limited—owns 375 out of 500 shares.
The J. B. Moos Company—owns all of stock, 2,000 shares.
J. & B. Moos—owns all of common stock, 1,000 shares.
Porto Rican Leaf Tobacco Co.—owns 2,500 out of 5,000 shares.
The Smokers' Paradise Corporation—owns all of common stock (250 shares) and 349 of 500 shares preferred.

*Havana Tobacco Co.* has a stock interest in the following corporations:
H. de Cabanis y Carbajal—all of stock, 15,000 shares.
Hy. Clay and Bock & Co., Lim.—owns 9,749 out of 16,950 shares preferred and 14,687 out of 15,990 shares common.
    [The Hy. Clay, &c., Co. is owner of 16,667 shares of the ordinary capital stock of the Havana Cigar & Tobacco Factories, Limited; and also owns 64 shares of the 1.890 shares of the capital stock of the Vuelta Abajo S. S. Co.]
Cuban Tobacco Co.—owns all of stock, 50 shares.
Havana Commercial Co.—owns 55,562 out of 60,000 shares preferred and 124,718 out of 125,000 shares common.
[The Havana Commercial Co. owns all of the capital stock—100 shares —of the M. Valle y Co.—cigars.]
Havana Cigar & Tobacco Factories, Lim.—owns 6,774 out of 25,000 shares ordinary stock.
J. S. Murias y Co.—owns all of stock—7,500 shares.

*Blackwell's Durham Tobacco Co.*—in addition to a stock interest in the

moment to say that the bill averred the origin and nature
of the American Tobacco Company and the origin and
nature of all the other defendant corporations, whether
accessory or subsidiary, and the connection of the indi-
vidual defendants with such corporations.  In effect the
bill charged that the individual defendants and the de-
fendant corporations were engaged in a conspiracy in re-
straint of interstate and foreign trade in tobacco and
the products of tobacco and constituted a combination
in restraint of such trade in violation of the first section
of the act, and also were attempting to monopolize and
were actually a monopolization of such trade in violation
of the second section.  In support of these charges general
averments were made in the bill as to the wrongful pur-
pose and intent with which acts were committed which it
was alleged brought about the alleged wrongful result.

The prayer of the bill was as follows:

"Wherefore petitioner prays:

Amsterdam Supply Co., has the stock interest, indicated, in the
following defendant corporations:
     F. P. Penn Tobacco Co.—owns 1,002 out of 1,503 shares.
     Scotten-Dillon Co.—owns $10,000 out of $500,000 of stock.
     Wells-Whitehead Tobacco Co.—owns all of stock, 1,500 shares.
Conley Foil Company—owns all of the capital stock (3,000 shares) of
     the Johnson Tin Foil and Metal Co.
P. Lorillard Company—has a stock interest in the American Snuff
     Company and the Amsterdam Supply Co.
R. J. Reynolds Tobacco Co.—in addition to a stock interest in the
     Amsterdam Supply Company and the MacAndrews & Forbes
     Company, owns two-thirds of the 5,000 shares of stock of the
     Liipfert Scales Co.
The British-American Tobacco Co.—in addition to a small interest in
     the Amsterdam Supply Company, has the following stock interest
     in certain defendants:
     David Dunlop—plug—owns 3,000 of 4,500 shares.
     W. S. Mathews & Sons—smoking—owns 3,637 out of 5,000
     shares of stock.
     T. C. Williams Company—plug—owns all of stock, 4,000 shares.

"1. That the contracts, combinations, and conspiracies in restraint of trade and commerce among the States and with foreign nations, together with the attempts to monopolize and the monopolies of the same hereinbefore described be declared illegal and in violation of the act of Congress passed July 2, 1890, and subsequent acts, and that they be prevented and restrained by proper orders of the court.

"2. That the agreements, contracts, combinations, and conspiracies entered into by the defendants on or about September 27, 1902, and thereafter, and evidenced among other things by the two written agreements of that date, Exhibits 1 and 2 hereto, be declared illegal, and that injunctions issue restraining and prohibiting defendants from doing anything in pursuance of or in furtherance of the same within the jurisdiction of the United States.

"3. That the Imperial Tobacco Company, its officers, agents, and servants be enjoined from engaging in interstate or foreign trade and commerce within the jurisdiction of the United States until it shall cease to observe or act in pursuance of said agreements, contracts, combinations, and conspiracies entered into by it and other defendants on or about September 27, 1902, and thereafter, and evidenced among other things by the contracts of that date, Exhibits 1 and 2 hereto.

"4. That the British-American Tobacco Company be adjudged an unlawful instrumentality created solely for carrying into effect the objects and purposes of said contract, combination, and conspiracy entered into on or about September 27, 1902, and thereafter, and that it be enjoined from engaging in interstate or foreign trade and commerce within the jurisdiction of the United States.

"5. That the court adjudge the American Tobacco Company, the American Snuff Company, the American Cigar Company, the American Stogie Company, the MacAndrews & Forbes Company, and the Conley Foil Company is each a combination in restraint of interstate and

foreign trade and commerce; and that each has attempted and is attempting to monopolize, is in combination and conspiracy with other persons and corporations to monopolize, and has monopolized part of the trade and commerce among the several States and with foreign nations; and order and decree that each one of them be restrained from engaging in interstate or foreign commerce, or, if the court should be of opinion that the public interests will be better subserved thereby, that receivers be appointed to take possession of all the property, assets, business, and affairs of said defendants and wind up the same, and otherwise take such course in regard thereto as will bring about conditions in trade and commerce among the States and with foreign nations in harmony with law.

"6. That the holding of stock by one of the defendant corporations in another under the circumstances shown be declared illegal, and that each of them be enjoined from continuing to hold or own such shares in another and from exercising any right in connection therewith.

"7. That defendants, each and all, be enjoined from continuing to carry out the purposes of the above-described contracts, combinations, conspiracies, and attempts to monopolize by the means herein described, or by any other, and be required to desist and withdraw from all connection with the same.

"8. That each of the defendants be enjoined from purchasing leaf tobacco or from selling and distributing its manufactured output as a part of interstate and foreign trade and commerce in conjunction or combination with any other defendant, and from taking part or being interested in any agreement of combination intended to destroy competition among them in reference to such purchases or sales.

"9. That petitioner have such other, further and general relief as may be proper."

As to the answers, it suffices to say that all the individual

and corporate defendants other than the foreign corporations denied the charges of wrongdoing and illegal combination and the corporate defendants in particular in addition averred their right under state charters by virtue of which they existed to own and possess the property which they held and further averred that they were engaged in manufacturing and that any combination amongst them related only to that subject, and therefore was not within the Anti-trust Act. The two foreign corporations asserted the validity of their corporate organization and of the assailed agreements, and denied any participation in the alleged wrongful combination.

After the taking of much testimony before a special examiner, the case was heard before a court consisting of four judges, constituted under the expediting act of February 11, 1903. In deciding the case in favor of the Government each of the four judges delivered an opinion (164 Fed. Rep. 700). A final decree was entered on December 15, 1908. The petition was dismissed as to the English corporations, three of the subsidiary corporations, the United Cigar Stores Company and all the individual defendants. It was decreed that the defendants other than those against whom the petition was dismissed, had theretofore entered into and were parties to combinations in restraint of trade, etc., in violation of the Anti-trust Act and said defendants and each of them, their officers, agents, etc., were restrained and enjoined "from directly or indirectly doing any act or thing whatsoever in furtherance of the objects and purposes of said combinations and from continuing as parties thereto." It specifically found that each of the defendants, "The American Tobacco Company, American Snuff Company, American Cigar Company, American Stogie Company, and MacAndrews & Forbes Company constitutes and is itself a combination in violation of the said Act of Congress." The corporations thus named, their officers, etc., were next restrained

and enjoined "from further directly or indirectly engaging in interstate or foreign trade and commerce in leaf tobacco or the products manufactured therefrom or articles necessary or useful in connection therewith. But if any of said last-named defendants can hereafter affirmatively show the restoration of reasonably competitive conditions, such defendant may apply to this court for a modification, suspension or dissolution of the injunction herein granted against it." The decree then enumerated the various corporations which it was found held or claimed to own some or all of the capital stock of other corporations and particularly specified such other corporations, and then made the following restraining provisions:

"Wherefore each and all of defendants, The American Tobacco Company, the American Snuff Company, the American Cigar Company, P. Lorillard Company, R. J. Reynolds Tobacco Company, Blackwell's Durham Tobacco Company and Conley Foil Company, their officers, directors, agents, servants and employés are hereby restrained and enjoined from acquiring by conveyance or otherwise, the plant or business of any such corporation wherein any one of them now holds or owns stock; and each and all of said defendant corporations so holding stock in other corporations as above specified, their officers, directors, agents, servants and employés, are further enjoined from voting or attempting to vote said stock at any meeting of the stockholders of the corporation issuing the same and from exercising or attempting to exercise any control, direction, supervision or influence whatsoever over the acts and doings of such corporation. And it is further ordered and decreed that each and every of the defendant corporations the stock of which is held by any other defendant corporation as hereinbefore shown, their officers, directors, servants and agents, be and they are hereby respectively and collectively restrained and enjoined from permitting the stock so held to be voted by any other de-

fendant holding or claiming to own the same or by its attorneys or agents at any corporate election for directors or officers and from permitting or suffering any other defendant corporation claiming to own or hold stock therein, or its officers or agents, to exercise any control whatsoever over its corporate acts."

Judgment for costs was given in favor of the petitioner and against the defendants as to whom the petition had not been dismissed, except the R. P. Richardson, Jr., & Company, a corporation which had consented to the decree. The decree also contained a provision that the defendants or any of them should not be prevented "from the institution, prosecution or defense of any suit, action or proceeding to prevent or restrain the infringement of a trade-mark used in interstate commerce or otherwise assert or defend a claim to any property or rights." In the event of a taking of an appeal to this court, the decree provided that the injunction which it directed "shall be suspended during the pendency of such appeal."

The United States appealed, as did also the various defendants against whom the decree was entered. For the Government it is contended: 1. That the petition should not have been dismissed as to the individual defendants. 2. That it should not have been dismissed as to the two foreign corporations—the Imperial Tobacco Company and the British-American Tobacco Company and the domestic corporations controlled by the latter, and that, on the contrary, the decree should have commanded the observance of the Anti-trust Act by the foreign corporations so far as their dealings in the United States were concerned, and should have restrained those companies from doing any act in the United States in violation of the Anti-trust Act, whether or not the right to do said acts was asserted to have arisen pursuant to the contracts made outside of or within the United States. 3. The petition should not have been dismissed as to the United Cigar Stores

Company.   4. The final decree should have adjudged defendants parties to unlawful contracts and conspiracies. 5. The final decree should have adjudged that defendants were attempting to monopolize and had monopolized parts of commerce.  More particularly, it is urged, it should have adjudged that the American Tobacco Company, American Snuff Company, American Cigar Company, American Stogie Company, MacAndrews & Forbes Company, the Conley Foil Company and the British-American Tobacco Company were severally attempting to monopolize and had monopolized parts of commerce, and that appropriate remedies should have been applied.   6. The decree was not sufficiently specific, since it should have described with more particularity the methods which the defendants had followed in forming and carrying out their unlawful purpose, and should have prohibited the resort to similar methods.   7. The decree should have specified the shares in corporations disclosed by the evidence to be owned by the parties to the conspiracy, and should have enjoined those parties from exercising any control over the corporations in which such stock was held, and the latter, if made defendant, from permitting such control, and should have also enjoined the collecting of any dividends upon the stock.   8. The decree improperly provided that nothing therein should prevent defendants from prosecuting or defending suits; also improperly suspended the injunction pending appeal.

The defendants, by their assignments of error, complain because the petition was not dismissed as to all, and more specifically, (a) because they were adjudged parties to a combination in restraint of interstate and foreign commerce, and enjoined accordingly; (b) because certain defendant corporations holding shares in others were enjoined from voting them or exercising control over the issuing company, and the latter from permitting this; and (c) because the American Tobacco Company, American

Snuff Company, American Cigar Company, American Stogie Company and the MacAndrews & Forbes Company were adjudged unlawful combinations and restrained from engaging in interstate and foreign commerce.

The elaborate arguments made by both sides at bar present in many forms of statement the conflicting contentions resulting from the nature and character of the suit and the defense thereto, the decree of the lower court and the propositions assigned as error to which we have just referred. In so far as all or any of these contentions, as many of them in fact do, involve a conflict as to the application and effect of §§ 1 and 2 of the Anti-trust Act, their consideration has been greatly simplified by the analysis and review of that act and the construction affixed to the sections in question in the case of *Standard Oil Company* v. *United States*, quite recently decided, *ante*, p. 1. In so far as the contentions relate to the disputed propositions of fact, we think from the view which we take of the case they need not be referred to, since in our opinion the case can be disposed of by considering only those facts which are indisputable and by applying to the inferences properly deducible from such facts the meaning and effect of the law as expounded in accordance with the previous decisions of this court.

We shall divide our investigation of the case into three subjects: First, the undisputed facts; second, the meaning of the Anti-trust Act and its application as correctly construed to the ultimate conclusions of fact deducible from the proof; third, the remedies to be applied.

*First. Undisputed facts.*

The matters to be considered under this heading we think can best be made clear by stating the merest outline of the condition of the tobacco industry prior to what is asserted to have been the initial movement in the combination which the suit assails and in the light so afforded to briefly recite the history of the assailed acts and con-

tracts. We shall divide the subject into two periods, (a) the one from the time of the organization of the first or old American Tobacco Company in 1890 to the organization of the Continental Tobacco Company, and (b) from the date of such organization to the filing of the bill in this case.

Summarizing in the broadest way the conditions which obtained prior to 1890, as to the production, manufacture and distribution of tobacco, the following general facts are adequate to portray the situation.

Tobacco was grown in many sections of the country having diversity of soil and climate and therefore was subject to various vicissitudes resulting from the places of production and consequently varied in quality. The great diversity of use to which tobacco was applied in manufacturing caused it to be that there was a demand for all the various qualities. The demand for all qualities was not local, but widespread, extending as well to domestic as to foreign trade, and, therefore, all the products were marketed under competitive conditions of a peculiarly advantageous nature. The manufacture of the product in this country in various forms was successfully carried on by many individuals or concerns scattered throughout the country, a larger number perhaps of the manufacturers being in the vicinage of production and others being advantageously situated in or near the principal markets of distribution.

Before January, 1890, five distinct concerns—Allen & Ginter, with factory at Richmond, Va.; W. Duke, Sons & Co., with factories at Durham, North Carolina, and New York City; Kinney Tobacco Company, with factory at New York City; W. S. Kimball & Company, with factory at Rochester, New York; Goodwin & Company, with factory at Brooklyn, New York—manufactured, distributed and sold in the United States and abroad 95 per cent of all the domestic cigarette and less than 8 per cent

of the smoking tobacco produced in the United States. There is no doubt that these factories were competitors in the purchase of the raw product which they manufactured and in the distribution and sale of the manufactured products. Indeed it is shown that prior to 1890 not only had normal and ordinary competition existed between the factories in question, but that the competition had been fierce and abnormal. In January, 1890, having agreed upon a capital stock of $25,000,000, all to be divided amongst them, and who should be directors, the concerns referred to organized the American Tobacco Company in New Jersey, "for trading and manufacturing," with broad powers, and conveyed to it the assets and businesses, including good will and right to use the names of the old concerns; and thereafter this corporation carried on the business of all. The $25,000,000 of stock of the Tobacco Company was allotted to the charter members as follows: Allen & Ginter, $3,000,000 preferred, $4,500,000 common; W. Duke, Sons & Co., $3,000,000 preferred, $4,500,000 common; Kinney Tobacco Company, $2,000,000 preferred, $3,000,000 common; W. S. Kimball & Co., $1,000,000 preferred, $1,500,000 common; and Goodwin & Co., $1,000,000 preferred, $1,500,000 common.

There is a charge that the valuation at which the respective properties were capitalized in the new corporation was enormously in excess of their actual value. We, however, put that subject aside, since we propose only to deal with facts which are not in controversy.

Shortly after the formation of the new corporation the Goodwin & Co. factory was closed, and the directors ordered "that the manufacture of all tobacco cigarettes be concentrated at Richmond." The new corporation in 1890, the first year of its operation, manufactured about two and one half billion cigarettes, that is, about 96 or 97 per cent of the total domestic output, and about five and one-half million pounds of smoking tobacco out

of a total domestic product of nearly seventy million pounds.

In a little over a year after the organization of the company it increased its capital stock by ten million dollars. The purpose of this increase is inferable from the considerations which we now state.

There was a firm known as Pfingst, Doerhoefer & Co., consisting of a number of partners, who had been long and successfully carrying on the business of manufacturing plug tobacco in Louisville, Kentucky, and distributing it through the channels of interstate commerce. In January, 1891, this firm was converted into a corporation known as the National Tobacco Works, having a capital stock of $400,000 all of which was issued to the partners. Almost immediately thereafter, in the month of February, the American Tobacco Company became the purchaser of all the capital stock of the new corporation, paying $600,000 cash and $1,200,000 in stock of the American Tobacco Company. The members of the previously existing firm bound themselves by contract with the American Tobacco Company to enter its service and manage the business and property sold, and each further agreed that for ten years he would not engage in carrying on, directly or indirectly, or permit or suffer the use of his name in connection with the carrying on of the tobacco business in any form.

In April following, the American Tobacco Company bought out the business of Philip Whitlock, of Richmond, Virginia, who was engaged in the manufacture of cheroots and cigars, and with the exclusive right to use the name of Whitlock. The consideration for this purchase was $300,000, and Whitlock agreed to become an employé of the American Tobacco Company for a number of years and not to engage for twenty years in the tobacco business.

In the month of April the American Tobacco Company also acquired the business of Marburg Brothers, a well-known firm located at Baltimore, Maryland, and engaged

in the manufacture and distribution of tobacco, principally smoking and snuff. The consideration was a cash payment of $164,637.65 and stock to the amount of $3,075,000. The members of the firm also conveyed the right to the use of the firm name and agreed not to engage in the tobacco business for a lengthy period.

Again, in the same month, the American Tobacco Company bought out a tobacco firm of old standing, also located in Baltimore, known as G. W. Gail & Ax, engaged principally in manufacturing and selling smoking tobacco, buying with the business the exclusive right to use the name of the firm or the partners, and the members of the firm agreed not to engage in the tobacco business for a specified period. The consideration for this purchase was $77,582.66 in cash and stock to the amount of $1,760,000. The plant was abandoned soon after.

The result of these purchases was manifested at once in the product of the company for the year 1891, as will appear from a note in the margin.[1] It will be seen that as to cheroots, smoking tobacco, fine cut tobacco, snuff and plug tobacco, the company had become a factor in all branches of the tobacco industry.

Referring to the occurrences of the year 1891, as in all

---

[1] The output of the American Tobacco Company for 1891 was—

|  | Number. | Pounds. |
|---|---|---|
| Cigarettes | 2,788,778,000 | ...... |
| Cheroots and little cigars | 40,009,000 | ...... |
| Smoking | ...... | 13,813,355 |
| Fine cut | ...... | 560,633 |
| Snuff | ...... | 383,162 |
| Plug | ...... | 4,442,774 |
| Total output for the United States, 1891— |  |  |
| Cigarettes | 3,137,318,596 | ...... |
| Smoking | ...... | 76,708,300 |
| Fine cut | ...... | 16,968,870 |
| Plug and twist | ...... | 166,177,915 |
| Snuff | ...... | 10,674,241 |

respects typical of the occurrences which took place in all the other years of the first period, that is during the years 1892, 1893, 1894, 1895, 1896, 1897 and 1898, we content ourselves with saying that it is undisputed that between February, 1891, and October, 1898, including the purchases which we have specifically referred to, the American Tobacco Company acquired fifteen going tobacco concerns doing business in the States of Kentucky, Louisiana, Maryland, Michigan, Missouri, New York, North Carolina and Virginia. For ten of the plants an all cash consideration of $6,410,235.26 was paid, while the payments for the remaining five aggregated in cash $1,115,100.95 and in stock $4,123,000. It is worth noting that the last purchase, in October, 1898, was of the Drummond Tobacco Company, a Missouri corporation dealing principally in plug, for which a cash consideration was paid of $3,457,500.

The corporations which were combined for the purpose of forming the American Tobacco Company produced a very small portion of plug tobacco. That an increase in this direction was contemplated is manifested by the almost immediate increase of the stock and its use for the purpose of acquiring, as we have indicated, in 1891 and 1892, the ownership and control of concerns manufacturing plug tobacco and the consequent increase in that branch of production. There is no dispute that as early as 1893 the president of the American Tobacco Company, by authority of the corporation, approached leading manufacturers of plug tobacco and sought to bring about a combination of the plug tobacco interests, and upon the failure to accomplish this, ruinous competition, by lowering the price of plug below its cost, ensued. As a result of this warfare, which continued until 1898, the American Tobacco Company sustained severe losses aggregating more than four millions of dollars. The warfare produced its natural result, not only because the company acquired

during the last two years of the campaign, as we have stated, control of important plug tobacco concerns, but others engaged in that industry came to terms. We say this because in 1898, in connection with several leading plug manufacturers, the American Tobacco Company organized a New Jersey corporation styled the Continental Tobacco Company, for "trading and manufacturing," with a capital of $75,000,000, afterwards increased to $100,000,000. The new company issued its stock and took transfers to the plants, assets and businesses of five large and successful competing plug manufacturers.[1]

The American Tobacco Company also conveyed to this corporation, at large valuations, the assets, brands, real estate and good will pertaining to its plug tobacco business, including the National Tobacco Works, the James G. Butler Tobacco Co., Drummond Tobacco Company, and Brown Tobacco Co., receiving as consideration $30,274,200 of stock (one-half common and one-half preferred), $300,000 cash, and an additional sum for losses sustained in the plug business during 1898, $840,035. Mr. Duke, the president of the American Tobacco Company, also became president of the Continental Company.

Under the preliminary agreement which was made looking to the formation of the Continental Tobacco

---

[1] P. J. Sorg Co., having factory at Middletown, Ohio, who received preferred stock $4,350,000, common stock $4,525,000, and cash $224,375.

John Finzer and Brothers, having factory at Louisville, Kentucky, who received preferred stock $2,250,000, common stock $3,050,000, and cash $550,000.

Daniel Scotten & Co., having factory at Detroit, Michigan, who received preferred stock $1,911,100, and common stock $3,012,500.

P. H. Mayo & Bros., having factory at Richmond, Va., who received preferred stock $1,250,000, common stock $1,925,000, and cash $66,125.

John Wright Co., having factory at Richmond, Va., who received preferred stock $495,000, common stock $495,000, and cash $4,116.67.

Company, that company acquired from the holders all the
$3,000,000 of the common stock of the P. Lorillard Com-
pany in exchange for $6,000,000 of its stock, and $1,581,300
of the $2,000,000 preferred in exchange for notes aggregat-
ing a sum considerably larger. The Lorillard Company,
however, although it thus passed practically under the
control of the American Tobacco Company by virtue of
its ownership of stock in the Continental Company, was
not liquidated, but its business continued to be conducted
as a distinct corporation, its goods being marked and put
upon the market just as if they were the manufacture of
an independent concern. ·

Following the organization of the Continental Tobacco
Company the American Tobacco Company increased its
capital stock from thirty-five millions of dollars to seventy
millions of dollars, and declared a stock dividend of one
hundred per cent on its common stock, that is, a stock
dividend of $21,000,000.

As the facts just stated bring us to the end of the first
period which at the outset we stated it was our purpose
to review, it is well briefly to point out the increase in
the power and control of the American Tobacco Com-
pany and the extension of its activities to all forms of to-
bacco products which had been accomplished just prior
to the organization of the Continental Tobacco Company.
Nothing could show it more clearly than the following:
At the end of the time the company was manufacturing
eighty-six per cent or thereabouts of all the cigarettes
produced in the United States, above twenty-six per cent
of all the smoking tobacco, more than twenty-two per cent
of all plug tobacco, fifty-one per cent of all little cigars,
six per cent each of all snuff and fine cut tobacco, and over
two per cent of all cigars and cheroots.

A brief reference to the occurrences of the second period,
that is, from and after the organization of the Continental
Tobacco Company up to the time of the bringing of this

suit, will serve to make evident that the transactions in their essence had all the characteristics of the occurrences of the first period.

In the year 1899 and thereafter either the American or the Continental company, for cash or stock, at an aggregate cost of fifty millions of dollars ($50,000,000), bought and closed up some thirty competing corporations and partnerships theretofore engaged in interstate and foreign commerce as manufacturers, sellers, and distributors of tobacco and related commodities, the interested parties covenanting not to engage in the business. Likewise the two corporations acquired for cash, by issuing stock, and otherwise, control of many competing corporations, now going concerns, with plants in various States, Cuba and Porto Rico, which manufactured, bought, sold and distributed tobacco products or related articles throughout the United States and foreign countries, and took from the parties in interest covenants not to engage in the tobacco business.

The plants thus acquired were operated until the merger in 1904, to which we shall hereafter refer, as a part of the general system of the American and Continental companies. The power resulting from and the purpose contemplated in making these acquisitions by the companies just referred to, however, may not be measured by considering alone the business of the company directly acquired, since some of those companies were made the vehicles as representing the American or Continental company for acquiring and holding the stock of other and competing companies, thus amplifying the power resulting from the acquisitions directly made by the American or Continental company, without ostensibly doing so. It is besides undisputed that in many instances the acquired corporations with the subsidiary companies over which they had control through stock ownership were carried on ostensibly as independent concerns disconnected

from either the American or the Continental company, although they were controlled and owned by one or the other of these companies. Without going into details on these subjects, for the sake of brevity, we append in the margin a statement of the corporations thus acquired, with the mention of the competing concerns which such corporations acquired.[1]

---

[1] Monopol Tobacco Works (New York, N. Y.)—Capital $40,000—cigarettes and smoking tobacco. In 1899 the American Tobacco Co. acquired all the shares for $250,000, and it is now a selling agency.

Luhrman & Wilbern Tobacco Company (Middletown, Ohio)—Capital $900,000—scrap tobacco. This business was formerly carried on by a partnership.

Mengel Box Company (Louisville, Ky.)—Capital $2,000,000—boxes for packing tobacco. This company has acquired the stock ($150,000) of Columbia Box Company and of Tyler Box Company ($25,000), both at St. Louis.

The Porto Rican-American Tobacco Company (Porto Rico)—Capital $1,799,600. In 1899 the American Company caused the organization of the Porto Rican-American Tobacco Company, which took over the partnership business of Rucabado y Portela—manufacturer of cigars and cigarettes—with covenants not to compete. The American Tobacco Company and American Cigar Company each hold $585,300 of the stock; the balance is in the hands of individuals.

Kentucky Tobacco Product Company (Louisville, Ky.)—Capital $1,000,000. In 1899 the Continental Company acquired control of the Louisville Spirit-Cured Tobacco Co., engaged in curing and treating tobacco and utilizing the stems for fertilizers. By agreement, the Kentucky Tobacco Product Company was organized in New Jersey, with $1,000,000 capital, $450,000 issued to the old stockholders, and $550,000 to Continental Company as consideration for agreement to supply stems.

Golden Belt Manufacturing Company (North Carolina)—Capital, $700,000—cotton bags and containers. In 1899 the American Tobacco Company acquired the business of this corporation, which was formed to take over a going business.

The Conley Foil Company (New York)—Tinfoil Combination—Capital, $825,000. In December, 1899, The American Tobacco Company secured control of the business of John Conley & Son (Partnership), New York, N. Y., manufacturers of tinfoil, an essential for pack-

It is of the utmost importance to observe that the ac-
quisitions made by the subsidiary corporations in some
cases likewise show the remarkable fact stated above, that
is, the disbursement of enormous amounts of money to

ing tobacco products. By agreement the Conley Foil Company was
incorporated in New Jersey "for trading and manufacturing," etc.,
with $250,000 capital (afterwards $375,000 and $825,000)—which took
over the firm's business and assets, etc., and The American Tobacco
Company became owner of the majority shares. The Conley Foil
Company has acquired all the stock of the Johnson Tinfoil & Metal
Company—a defendant—of St. Louis, a leading competitor, and they
supply under fixed contracts, the tinfoil used by defendants.

R. J. Reynolds Tobacco Company (Winston-Salem, North Caro-
lina). In 1899 the Continental Tobacco Company acquired control of
the R. J. Reynolds Tobacco Company, one of the largest manufactur-
ers of plug—output in 1898, 6,000,000 pounds. By agreement, a new
corporation (with same name) was organized in New Jersey and
capitalized at $5,000,000 (afterwards $7,525,000), which took over the
business and assets of the old one. The Continental Company immedi-
ately acquired the majority shares and The American Company now
holds $5,000,000 of stock. The separate organization has been pre-
served.

There was acquired in the name of the new Reynolds Company,
with covenants against competition, the following plants:

In 1900, T. L. Vaughn & Company, partnership, of Winston, N. C.;
consideration, $90,506; Brown Brothers Company, a North Carolina
corporation, Winston, N. C.; consideration, $67,615; and P. H. Hanes
& Company and B. F. Hanes & Company, Winston, N. C., partner-
ship; consideration, $671,950.

In 1905, Rucker & Witten Tobacco Company, Martinsville, Va.;
consideration, $512,898.

In 1906, D. H. Spencer & Company, Martinsville, Va.; considera-
tion, $314,255.

(All of the foregoing plants were closed as soon as purchased.)

A majority of the $400,000 capital stock in the Liipfert-Scales Com-
pany, of Winston, N. C., a corporation largely engaged in the manu-
facture of plug tobacco and interstate and foreign commerce in leaf
tobacco and its products, was acquired by the Reynolds Company.
The separate organization of the Liipfert-Scales Company is preserved
and the business carried on under its corporate name.

The R. J. Reynolds Tobacco Company also holds $98,300 of stock of

acquire plants, which on being purchased were not utilized but were immediately closed. It is also to be remarked, that the facts stated in the memorandum in the margin show on their face a singular identity between the conceptions which governed the transactions of this latter period with those which evidently existed at the very birth of the original organization of the American Tobacco Company, as exemplified by the transactions in the first period. A statement of particular transactions outside of those previously referred to as having occurred during the period in question will serve additionally to make the situation clear. And to accomplish this purpose we shall, as briefly as may be consistent with clarity, separately refer to the facts concerning the organization during the

the MacAndrews & Forbes Company and $9,600 of the Amsterdam Supply Company.

Blackwell's Durham Tobacco Company (Durham, N. C.)—Capital $1,000,000. In 1899 The American Tobacco Company procured for $4,000,000 all the stock of Blackwell's Durham Tobacco Company at Durham, N. C., manufacturer and distributer of tobacco products. Thereupon the Blackwell's Durham Tobacco Company, of New Jersey, capital, $1,000,000, all owned by the American, was organized and took over the assets of the old company, then under receivership. Its separate organization has been preserved.

The Durham Company has acquired control of the following competitors—Reynold's Tobacco Company; F. R. Penn Tobacco Company; and Wells-Whitehead Tobacco Company.

The following companies came also under the control of the American Tobacco Company through acquired stock ownership.

S. Anargyros—capital $650,000—Turkish cigarettes. In 1890 The American Tobacco Company procured the organization of corporation of S. Anargyros, which took over that individual's going business and has since controlled it. Through this company the business in Turkish cigarettes is largely conducted.

The John Bollman Company (San Francisco)—Capital $200,000—cigarettes. In 1900 The American Tobacco Company procured organization of The John Bollman Company, which took over the business of the former concern in exchange for stock. Its separate organization has been preserved.

second period of the five corporations which were named
as defendants in the bill, as heretofore stated and which
for the purpose of designation we have hitherto classified
as accessory defendants, such corporations being the
American Snuff Company, American Cigar Company,
American Stogie Company, MacAndrews & Forbes Com-
pany (licorice), and Conley Foil Company.

(1). *The American Snuff Company.*

As we have seen, the American Tobacco Company at
the commencement of the first period produced a very
small quantity of snuff. Its capacity, however, in that
regard was augmented owing particularly to the formation
of the Continental Tobacco Company and the acquisition
of the Lorillard Company, by which it came to be a serious
factor as a snuff producer. There shortly ensued an
aggressive competition in the snuff business between the
American Tobacco Company, with the force acquired
from the vantage ground resulting from the dominancy
of its expanded organization, and others in the trade oper-
ating independently of that organization. The result was
identical with that which had previously arisen from like
conditions in the past.

In March, 1900, there was organized in New Jersey a
corporation known as The American Snuff Company, with
a capital of $25,000,000, one-half preferred and one-half
common, which took over the snuff business of the P.
Lorillard Company, Continental Tobacco Company and
The American Tobacco Company, with that of a large
competitor, viz: The Atlantic Snuff Co. The stock of
the new company was thus apportioned: Atlantic Snuff
Company, preferred, $7,500,000, common, $25,000,000;
P. Lorillard Company, preferred, $1,124,700, common,
$3,459,400; The American Tobacco Company, preferred,
$1,177,800, common, $3,227,500; Continental Tobacco
Company, preferred, $197,500, common, $813,100. The
stock issued to Continental Tobacco Company and the

defendants, P. Lorillard Company and the American Tobacco Company, is still held by the latter, and they have at all times had a controlling interest in the Snuff Company. All the companies, together with their officers and directors, covenanted that they would not thereafter engage as competitors in the tobacco business or the manufacture, sale, or distribution of snuff.

Among the assets transferred by the Atlantic Snuff Company to American Snuff Company were all the shares ($600,000) of W. E. Garrett & Sons, Inc., then and now one of the oldest and very largest producers of snuff, for a long time and still engaged at Yorkland, Del., in interstate and foreign commerce in tobacco and its products, and which controlled through stock ownership the Southern Snuff Company, Memphis, Tenn.; Dental Snuff Company, Lynchburg, Va., and Stewart-Ralph Snuff Company, Clarksville, Tenn. The separate existence of W. E. Garrett & Sons, Inc., has been preserved and its business conducted under the corporate name. In March, 1900, the American Snuff Company acquired all the shares of George W. Helme Company, one of the oldest and largest producers of snuff and actively engaged at Helmetta, N. J., in interstate and foreign commerce in competition with defendants, by issuing in exchange therefor $2,000,000 preferred stock and $1,000,000 common; and it thereafter took a conveyance of all assets of the acquired company and now operates the plant under its own name.

As a result of the transactions just stated it came to pass that the American Tobacco Company, which had at the end of the first period only a very small percentage of the snuff manufacturing business, came virtually to have the dominant control as a manufacturer of that product.

2. *Conley Foil Company—manufacturers of tinfoil, an essential for packing tobacco products.*

In December, 1899, the American Tobacco Company secured control of the business of John Conley & Sons, a

partnership of New York City. By agreement the Conley Foil Company was incorporated in New York "for trading and manufacturing," etc., with $250,000 capital, ultimately increased to $825,000. The corporation took over the business and assets of the firm, and the American Tobacco Company became owner of a majority of the shares of stock. The Conley Foil Company has acquired all the shares of stock of the Johnson Tinfoil & Metal Company, of St. Louis, a leading competitor, and they supply under fixed contracts at remunerative prices the tinfoil used by the defendants, which constitutes the major part of the total production in the United States.

3. *American Cigar Company.*

Prior to 1901 the American and Continental tobacco companies manufactured, sold, and distributed cigars, stogies, and cheroots. In the year stated the companies determined to engage in the business upon a larger scale. Under agreement with Powell, Smith & Company, large manufacturers and dealers in cigars, they caused the incorporation in New Jersey of the American Cigar Company "for trading and manufacturing," etc., to which all three conveyed their said business, and it has since carried on the same. The American and Continental companies each acquired $46\frac{1}{2}$ per cent of the shares, and Powell, Smith & Company 7 per cent; the original capitalization was $10,000,000 (afterwards $20,000,000), and more than three-fourths is owned by the former. The Cigar Company acquired many competitors (partnerships and corporations) engaged in interstate and foreign commerce, taking from the parties covenants against engaging in the tobacco business; and it has also procured the organization of controlled corporations which have acquired competing manufacturers, jobbers and distributors in the United States, Cuba and Porto Rico. It manufactures, sells and distributes a considerable per centage of domestic cigars; is the dominating factor in the tobacco business,

foreign and domestic, in Cuba and Porto Rico, and is there engaged in tobacco planting. It also controls corporate jobbers in California, Alabama, Virginia, Pennsylvania, Georgia, Louisiana, New Jersey and Tennessee.

4. *The MacAndrews & Forbes Company—manufacturers of licorice.*

There is no question that licorice paste is an essential ingredient in the manufacture of plug tobacco, and that one who is debarred from obtaining such paste would therefore be unable to engage in or carry on the manufacture of such product. The control over this article was thus secured: In May, 1902, the Continental Company secured control of MacAndrews & Forbes Co. of Newark, New Jersey, and organized "for trading and manufacturing" a corporation known as the MacAndrews & Forbes Co., with a capital of $7,000,000, $4,000,000 preferred and $3,000,000 common, which took over the business of MacAndrews & Forbes and another large competitor. The Continental Company acquired two-thirds of the common stock by agreeing to purchase its supply of paste from the new company. The American Tobacco Company, at the time of the filing the bill, was the owner of $2,112,900 of the common stock and $750,000 preferred. By various purchases and agreements the MacAndrews & Forbes Company acquired, substantially, the business of all competitors. Thus, in June, 1902, it purchased the business of the Stamford Mfg. Co., of Stamford, Connecticut, and incorporated the National Licorice Company, which acquired the business of Young & Smylie and F. B. & V. P. Scudder; and the National Company agreed with MacAndrews & Forbes not to produce licorice for tobacco manufacturers. In 1906 all the stock in the J. S. Young Company ($1,800,000), which had been organized to take over the business of the J. S. Young Co. of Baltimore, Md., was acquired by the MacAndrews & Forbes Co. The MacAndrews & Forbes Co. use in excess

of ninety-five per cent of the licorice root consumed in the United States.

5. *American Stogie Company.*

In May, 1903, the American Cigar Company and the American and Continental Tobacco Companies caused the American Stogie Company to be incorporated in New Jersey, with $11,979,000 capital, which immediately took over the stogie and tobie business of the companies named in exchange for $8,206,275 stock and then in the usual ways acquired the business of others in the manufacture, sale, and distribution of such products, with covenants not to compete. It acquired in exchange for $3,647,725 stock all shares of United States Cigar Company (which had previously acquired and owned the business of important competitors) and subsequently took the conveyance of the plant and assets. The majority shares always have been held by defendant, the American Cigar Company.

As we think the legitimate inferences deducible from the undisputed facts which we have thus stated will be sufficient to dispose of the controversy, we do not deem it necessary to expand this statement so as to cause it to embrace a recital of the undisputed facts concerning the entry of the American Tobacco Company into the retail tobacco trade through the acquisition of a controlling interest in the stock of what is known as the United Cigar Stores Company, as well as to some other subjects which for the sake of brevity we likewise pass over, in order to come at once to a statement concerning the foreign companies.

*The English Companies.*

In September, 1901, the American Tobacco Co. purchased for $5,347,000 a Liverpool (Eng.) corporation, known as Ogden's Limited, there engaged in manufacturing and distributing tobacco products. A trade conflict which at once ensued caused many of the English manufacturers to combine into an incorporation known as the

Imperial Tobacco Company of Great Britain and Ireland, capital 15,000,000, afterwards increased to 18,000,000, pounds sterling. The trade war was continued between this corporation and the American Tobacco Company, with a result substantially identical with that which had hitherto, as we have seen, arisen from such a situation.

In September, 1902, the Imperial and the American companies entered into contracts (executed in England) stipulating that the former should limit its business to the United Kingdom, except purchasing leaf in the United States (it buys 54,000,000 pounds annually); that the American companies should limit their business to the United States, its dependencies and Cuba; and that the British-American Tobacco Company, with capital of 6,000,000 pounds sterling apportioned between them, should be organized, take over the export business of both, and operate in other countries, etc. This arrangement, was immediately put into effect, and has been observed.

The Imperial Company holds one-third and the American Company two-thirds of the capital stock of the British-American Tobacco Company, Limited. The latter company maintains a branch office in New York City and the vice-president of the American Tobacco Company is a principal officer. This company uses large quantities of domestic leaf, partly exported to various plants abroad and about half manufactured here and then exported. By agreement, all this is purchased through the American Tobacco Company. In addition to many plants abroad it has warehouses in various States and plants at Petersburg, Va., and Durham, N. C., where tobacco is manufactured and then exported.

The purchase of necessary leaf tobacco in the United States by the Imperial Company is now made through a resident general agent and is exported as a part of foreign commerce.

Not to break the continuity of the narrative of facts we

have omitted in the proper chronological order to state the facts relative to what was known as the Consolidated Tobacco Company. We now particularly refer to that subject.

*The Consolidated Tobacco Co.*

In June, 1901, parties largely interested in the American and Continental companies caused the incorporation in New Jersey of the Consolidated Tobacco Company, capital $30,000,000 (afterwards $40,000,000), with broad powers and perpetual existence; to do business throughout the world, and to guarantee securities of other companies, etc. A majority of shares was taken by a few individuals connected with the old concerns: A. N. Brady, J. B. Duke, A. H. Payne, Thomas Ryan, W. C. Whitney, and P. A. B. Widener. J. B. Duke, president of both the old companies, became president of the Consolidated. Largely in exchange for bonds the new company acquired substantially all the shares of common stock of the old ones. Its business, of holding and financing, was continued until 1904, when, with the American and Continental companies, it was merged into the present American Tobacco Company.

By proceedings in New Jersey, October, 1904, the (old) American Tobacco Company, Continental Tobacco Company and Consolidated Tobacco Company were merged into one corporation, under the name of The American Tobacco Company, the principal defendant here. The merged company, with perpetual existence, was capitalized at $180,000,000 ($80,000,000 preferred, ordinarily without power to vote).

The powers conferred by the charter are stated in the margin.[1]

---

[1] To buy, manufacture, sell and otherwise deal in tobacco and the products of tobacco in any and all forms; . . . to guarantee dividends on any shares of the capital stock of any corporation in which said merged corporation has an interest as stockholder; . . .

Prior to the merger the Consolidated Tobacco Company, a majority of whose $40,000,000 share capital was held by J. B. Duke, Thomas F. Ryan, William C. Whitney, Anthony N. Brady, Peter A. B. Widener and Oliver H. Payne, had acquired, as already stated, nearly all common shares of both old American and Continental companies, and thereby control. The preferred shares, however, were held by many individuals. Through the method of distribution of the stock of the new company, in exchange for shares in the old American and in the Continental Company, it resulted that the same six men in control of the combination through the Consolidated Tobacco Company continued that control by ownership of stock in the merged or new American Tobacco Company. The assets, property, etc., of the old companies passed to the American Tobacco Company (merged), which has since carried on the business.

The record indisputably discloses that after this merger the same methods which were used from the beginning continued to be employed. Thus, it is beyond dispute: First, that since the organization of the new American Tobacco Company that company has acquired four large tobacco concerns, that restrictive covenants against engaging in the tobacco business were taken from the sellers, and that the plants were not continued in operation but

---

to carry on any business operations deemed by such merged corporation to be necessary or advisable in connection with any of the objects of its incorporation or in furtherance of any thereof, or tending to increase the value of its property or stock; . . . to conduct business in all other States, territories, possessions and dependencies of the United States of America, and in all foreign countries; . . . to purchase or otherwise acquire and hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of the shares of the capital stock or of any bonds, securities, or other evidences of indebtedness created by any other corporation or corporations of this or any other State or government, and to issue its own obligations in payment or exchange therefor. . . .

were at once abandoned. Second, that the new company has besides acquired control of eight additional concerns, the business of such concerns being now carried on by four separate corporations, all absolutely controlled by the American Tobacco Company, although the connection as to two of these companies with that corporation was long and persistently denied.

Thus reaching the end of the second period and coming to the time of the bringing of the suit, brevity prevents us from stopping to portray the difference between the condition in 1890 when the (old) American Tobacco Company was organized by the consolidation of five competing cigarette concerns and that which existed at the commencement of the suit. That situation and the vast power which the principal and accessory corporate defendants and the small number of individuals who own a majority of the common stock of the new American Tobacco Company exert over the marketing of tobacco as a raw product, its manufacture, its marketing when manufactured, and its consequent movement in the channels of interstate commerce indeed relatively over foreign commerce, and the commerce of the whole world, in the raw and manufactured products stand out in such bold relief from the undisputed facts which have been stated as to lead us to pass at once to the second fundamental proposition which we are required to consider. That is, the construction of the Anti-trust Act and the application of the act as rightly construed to the situation as proven in consequence of having determined the ultimate and final, inferences properly deducible from the undisputed facts which we have stated.

*The construction and application of the Anti-trust Act.*

If the Anti-trust Act is applicable to the entire situation here presented and is adequate to afford complete relief for the evils which the United States insists that situation presents it can only be because that law will be given a

more comprehensive application than has been affixed to it in any previous decision. This will be the case because the undisputed facts as we have stated them involve questions as to the operation of the Anti-trust Act not hitherto presented in any case. Thus, even if the ownership of stock by the American Tobacco Company in the accessory and subsidiary companies and the ownership of stock in any of those companies among themselves were held, as was decided in *United States* v. *Standard Oil Co.*, to be a violation of the act and all relations resulting from such stock ownership were therefore set aside, the question would yet remain whether the principal defendant, the American Tobacco Company, and the five accessory defendants, even when divested of their stock ownership in other corporations, by virtue of the power which they would continue to possess, even although thus stripped, would amount to a violation of both the first and second sections of the act. Again, if it were held that the corporations, the existence whereof was due to a combination between such companies and other companies was a violation of the act, the question would remain whether such of the companies as did not owe their existence and power to combinations but whose power alone arose from the exercise of the right to acquire and own property would be amenable to the prohibitions of the act. Yet further: Even if this proposition was held in the affirmative the question would remain whether the principal defendant, the American Tobacco Company, when stripped of its stock ownership, would be in and of itself within the prohibitions of the act although that company was organized and took being before the Anti-trust Act was passed. Still further, the question would yet remain whether particular corporations which, when bereft of the power which they possessed as resulting from stock ownership, although they were not inherently possessed of a sufficient residuum of power to cause them to be in

and of themselves either a restraint of trade or a monopolization or an attempt to monopolize; should nevertheless be restrained because of their intimate connection and association with other corporations found to be within the prohibitions of the act. The necessity of relief as to all these aspects, we think, seemed to the Government so essential, and the difficulty of giving to the act such a comprehensive and coherent construction as would be adequate to enable it to meet the entire situation, led to what appears to us to be in their essence a resort to methods of construction not compatible one with the other. And the same apparent conflict is presented by the views of the act taken by the defendants when their contentions are accurately tested. Thus the Government, for the purpose of fixing the illegal character of the original combination which organized the old American Tobacco Company, asserts that the illegal character of the combination is plainly shown because the combination was brought about to stay the progress of a flagrant and ruinous trade war. In other words, the contention is that as the act forbids every contract, and combination, it hence prohibits a reasonable and just agreement made for the purpose of ending a trade war. But as thus construing the act by the rule of the letter which kills, would necessarily operate to take out of the reach of the act some one of the accessory and many subsidiary corporations, the existence of which depend not at all upon combination or agreement or contract, but upon mere purchases of property, it is insisted in many forms of argument that the rule of construction to be applied must be the spirit and intent of the act and therefore its prohibitions must be held to extend to acts even if not within the literal terms of the statute if they are within its spirit because done with an intent to bring about the harmful results which it was the purpose of the statute to prohibit. So as to the defendants. While it is argued on the one hand that the forms by which various properties

were acquired in view of the letter of the act exclude many of the assailed transactions from condemnation, it is yet urged that giving to the act the broad construction which it should rightfully receive, whatever may be the form, no condemnation should follow, because, looking at the case as a whole, every act assailed is shown to have been but a legitimate and lawful result of the exertion of honest business methods brought into play for the purpose of advancing trade instead of with the object of obstructing and restraining the same. But the difficulties which arise, from the complexity of the particular dealings which are here involved and the situation which they produce, we think grows out of a plain misconception of both the letter and spirit of the Anti-trust Act. We say of the letter, because while seeking by a narrow rule of the letter to include things which it is deemed would otherwise be excluded, the contention really destroys the great purpose of the act, since it renders it impossible to apply the law to a multitude of wrongful acts, which would come within the scope of its remedial purposes by resort to a reasonable construction, although they would not be within its reach by a too narrow and unreasonable adherence to the strict letter. This must be the case unless it be possible in reason to say that for the purpose of including one class of acts which would not otherwise be embraced a literal construction although in conflict with reason must be applied and for the purpose of including other acts which would not otherwise be embraced a reasonable construction must be resorted to. That is to say two conflicting rules of construction must at one and the same time be applied and adhered to.

The obscurity and resulting uncertainty however, is now but an abstraction because it has been removed by the consideration which we have given quite recently to the construction of the Anti-trust Act in the *Standard Oil Case.* In that case it was held, without departing from

any previous decision of the court that as the statute had not defined the words restraint of trade, it became necessary to construe those words, a duty which could only be discharged by a resort to reason. We say the doctrine thus stated was in accord with all the previous decisions of this court, despite the fact that the contrary view was sometimes erroneously attributed to some of the expressions used in two prior decisions (the *Trans-Missouri Freight Association* and *Joint Traffic cases,* 166 U. S. 290, and 171 U. S. 505). That such view was a mistaken one was fully pointed out in the *Standard Oil Case* and is additionally shown by a passage in the opinion in the *Joint Traffic Case* as follows (171 U. S. 568): "The act of Congress must have a reasonable construction, or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing on interstate commerce, and possibly to restrain it." Applying the rule of reason to the construction of the statute, it was held in the *Standard Oil Case* that as the words "restraint of trade" at common law and in the law of this country at the time of the adoption of the Anti-trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance. It was therefore pointed out that the statute did not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose. In other words, it was held, not that acts which the statute prohibited could be removed from the control of its prohibitions by a finding

that they were reasonable, but that the duty to interpret which inevitably arose from the general character of the term restraint of trade required that the words restraint of trade should be given a meaning which would not destroy the individual right to contract and render difficult if not impossible any movement of trade in the channels of interstate commerce—the free movement of which it was the purpose of the statute to protect. The soundness of the rule that the statute should receive a reasonable construction, after further mature deliberation, we see no reason to doubt. Indeed, the necessity for not departing in this case from the standard of the rule of reason which is universal in its application is so plainly required in order to give effect to the remedial purposes which the act under consideration contemplates, and to prevent that act from destroying all liberty of contract and all substantial right to trade, and thus causing the act to be at war with itself by annihilating the fundamental right of freedom to trade which, on the very face of the act, it was enacted to preserve, is illustrated by the record before us. In truth, the plain demonstration which this record gives of the injury which would arise from and the promotion of the wrongs which the statute was intended to guard against which would result from giving to the statute a narrow, unreasoning and unheard of construction, as illustrated by the record before us, if possible serves to strengthen our conviction as to the correctness of the rule of construction, the rule of reason, which was applied in the *Standard Oil Case*, the application of which rule to the statute we now, in the most unequivocal terms, reëxpress and re-affirm.

Coming then to apply to the case before us the act as interpreted in the Standard Oil and previous cases, all the difficulties suggested by the mere form in which the assailed transactions are clothed become of no moment. This follows because although it was held in the *Standard*

*Oil Case* that, giving to the statute a reasonable construction, the words "restraint of trade" did not embrace all those normal and usual contracts essential to individual freedom and the right to make which were necessary in order that the course of trade might be free, yet, as a result of the reasonable construction which was affixed to the statute, it was pointed out that the generic designation of the first and second sections of the law, when taken together, embraced every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed. That is to say, it was held that in view of the general language of the statute and the public policy which it manifested, there was no possibility of frustrating that policy by resorting to any disguise or subterfuge of form, since resort to reason rendered it impossible to escape by any indirection the prohibitions of the statute.

Considering then the undisputed facts which we have previously stated, it remains only to determine whether they establish that the acts, contracts, agreements, combinations, etc., which were assailed were of such an unusual and wrongful character as to bring them within the prohibitions of the law. That they were, in our opinion, so overwhelmingly results from the undisputed facts that it seems only necessary to refer to the facts as we have stated them to demonstrate the correctness of this conclusion. Indeed, the history of the combination is so replete with the doing of acts which it was the obvious purpose of the statute to forbid, so demonstrative of the existence from the beginning of a purpose to acquire dominion and control of the tobacco trade, not by the mere exertion of the ordinary right to contract and to trade, but by methods devised in order to monopolize the trade by driving competitors out of business, which were ruthlessly carried out upon the assumption that to work upon

the fears or play upon the cupidity of competitors would make success possible. We say these conclusions are inevitable, not because of the vast amount of property aggregated by the combination, not because alone of the many corporations which the proof shows were united by resort to one device or another. Again, not alone because of the dominion and control over the tobacco trade which actually exists, but because we think the conclusion of wrongful purpose and illegal combination is overwhelmingly established by the following considerations: *a.* By the fact that the very first organization or combination was impelled by a previously existing fierce trade war, evidently inspired by one or more of the minds which brought about and became parties to that combination. *b.* Because, immediately after that combination and the increase of capital which followed, the acts which ensued justify the inference that the intention existed to use the power of the combination as a vantage ground to further monopolize the trade in tobacco by means of trade conflicts designed to injure others, either by driving competitors out of the business or compelling them to become parties to a combination—a purpose whose execution was illustrated by the plug war which ensued and its results, by the snuff war which followed and its results, and by the conflict which immediately followed the entry of the combination in England and the division of the world's business by the two foreign contracts which ensued. *c.* By the ever-present manifestation which is exhibited of a conscious wrongdoing by the form in which the various transactions were embodied from the beginning, ever changing but ever in substance the same. Now the organization of a new company, now the control exerted by the taking of stock in one or another or in several, so as to obscure the result actually attained, nevertheless uniform, in their manifestations of the purpose to restrain others and to monopolize and retain power in the hands of the

few who, it would seem, from the beginning contemplated the mastery of the trade which practically followed. *d.* By the gradual absorption of control over all the elements essential to the successful manufacture of tobacco products, and placing such control in the hands of seemingly independent corporations serving as perpetual barriers to the entry of others into the tobacco trade. *e.* By persistent expenditure of millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for the purposes of trade. *f.* By the constantly recurring stipulations, whose legality, isolatedly viewed, we are not considering, by which numbers of persons, whether manufacturers, stockholders or employés, were required to bind themselves, generally for long periods, not to compete in the future. Indeed, when the results of the undisputed proof which we have stated are fully apprehended, and the wrongful acts which they exhibit are considered, there comes inevitably to the mind the conviction that it was the danger which it was deemed would arise to individual liberty and the public well-being from acts like those which this record exhibits, which led the legislative mind to conceive and to enact the Anti-trust Act, considerations which also serve to clearly demonstrate that the combination here assailed is within the law as to leave no doubt that it is our plain duty to apply its prohibitions.

In stating summarily, as we have done, the conclusions which, in our opinion, are plainly deducible from the undisputed facts, we have not paused to give the reasons why we consider, after great consideration, that the elaborate arguments advanced to affix a different complexion to the case are wholly devoid of merit. We do not, for the sake of brevity, moreover, stop to examine and discuss the various propositions urged in the argument at bar for the purpose of demonstrating that the subject-matter of the combination which we find to exist and the

combination itself are not within the scope of the Anti-trust Act because when rightly considered they are merely matters of intrastate commerce and therefore subject alone to state control. We have done this because the want of merit in all the arguments advanced on such subjects is so completely established by the prior decisions of this court, as pointed out in the *Standard Oil Case*, as not to require restatement.

Leading as this does to the conclusion that the assailed combination in all its aspects—that is to say, whether it be looked at from the point of view of stock ownership or from the standpoint of the principal corporation and the accessory or subsidiary corporations viewed independently, including the foreign corporations in so far as by the contracts made by them they became coöperators in the combination—comes within the prohibitions of the first and second sections of the Anti-trust Act, it remains only finally to consider the remedy which it is our duty to apply to the situation thus found to exist.

*The remedy.*

Our conclusion being that the combination as a whole, involving all its coöperating or associated parts, in whatever form clothed, constitutes a restraint of trade within the first section, and an attempt to monopolize or a monopolization within the second section of the Anti-trust Act, it follows that the relief which we are to afford must be wider than that awarded by the lower court, since that court merely decided that certain of the corporate defendants constituted combinations in violation of the first section of the act, because of the fact that they were formed by the union of previously competing concerns and that the other defendants not dismissed from the action were parties to such combinations or promoted their purposes. We hence, in determining the relief proper to be given, may not model our action upon that granted by the court below, but in order to enable us to

award relief coterminous with the ultimate redress of the wrongs which we find to exist, we must approach the subject of relief from an original point of view. Such subject necessarily takes a two-fold aspect—the character of the permanent relief required and the nature of the temporary relief essential to be applied pending the working out of permanent relief in the event that it be found that it is impossible under the situation as it now exists to at once rectify such existing wrongful condition. In considering the subject from both of these aspects three dominant influences must guide our action: 1. The duty of giving complete and efficacious effect to the prohibitions of the statute; 2, the accomplishing of this result with as little injury as possible to the interest of the general public; and, 3, a proper regard for the vast interests of private property which may have become vested in many persons as a result of the acquisition either by way of stock ownership or otherwise of interests in the stock or securities of the combination without any guilty knowledge or intent in any way to become actors or participants in the wrongs which we find to have inspired and dominated the combination from the beginning. Mindful of these considerations and to clear the way for their application we say at the outset without stopping to amplify the reasons which lead us to that conclusion, we think that the court below clearly erred in dismissing the individual defendants, the United Cigar Stores Company, and the foreign corporations and their subsidiary corporations.

Looking at the situation as we have hitherto pointed it out, it involves difficulties in the application of remedies greater than have been presented by any case involving the Anti-trust Act which has been hitherto considered by this court: First. Because in this case it is obvious that a mere decree forbidding stock ownership by one part of the combination in another part or entity thereof, would afford no adequate measure of relief, since different

ingredients of the combination would remain unaffected, and by the very nature and character of their organization would be able to continue the wrongful situation which it is our duty to destroy. Second. Because the methods of apparent ownership by which the wrongful intent was, in part, carried out and the subtle devices which, as we have seen, were resorted to for the purpose of accomplishing the wrong contemplated, by way of ownership or otherwise, are of such a character that it is difficult if not impossible to formulate a remedy which could restore in their entirety the prior lawful conditions. Third. Because the methods devised by which the various essential elements to the successful operation of the tobacco business from any particular aspect have been so separated under various subordinate combinations, yet so unified by way of the control worked out by the scheme here condemned, are so involved that any specific form of relief which we might now order in substance and effect might operate really to injure the public and, it may be, to perpetuate the wrong. Doubtless it was the presence of these difficulties which caused the United States, in its prayer for relief to tentatively suggest rather than to specifically demand definite and precise remedies. We might at once resort to one or the other of two general remedies—a, the allowance of a permanent injunction restraining the combination as a universality and all the individuals and corporations which form a part of or coöperate in it in any manner or form from continuing to engage in interstate commerce until the illegal situation be cured, a measure of relief which would accord in substantial effect with that awarded below to the extent that the court found illegal combinations to exist; or, b, to direct the appointment of a receiver to take charge of the assets and property in this country of the combination in all its ramifications for the purpose of preventing a continued violation of the law, and thus working out by a sale of the

property of the combination or otherwise, a condition of things which would not be repugnant to the prohibitions of the act.  But, having regard to the principles which we have said must control our action, we do not think we can now direct the immediate application of either of these remedies.  We so consider as to the first because in view of the extent of the combination, the vast field which it covers, the all-embracing character of its activities concerning tobacco and its products, to at once stay the movement in interstate commerce of the products which the combination or its coöperating forces produce or control might inflict infinite injury upon the public by leading to a stoppage of supply and a great enhancement of prices. The second because the extensive power which would result from at once resorting to a receivership might not only do grievous injury to the public, but also cause widespread and perhaps irreparable loss to many innocent people. Under these circumstances, taking into mind the complexity of the situation in all of its aspects and giving weight to the many-sided considerations which must control our judgment, we think, so far as the permanent relief to be awarded is concerned, we should decree as follows: 1st. That the combination in and of itself, as well as each and all of the elements composing it, whether corporate or individual, whether considered collectively or separately, be decreed to be in restraint of trade and an attempt to monopolize and a monopolization within the first and second sections of the Anti-trust Act.  2d. That the court below, in order to give effective force to our decree in this regard, be directed to hear the parties, by evidence or otherwise, as it may be deemed proper, for the purpose of ascertaining and determining upon some plan or method of dissolving the combination and of recreating, out of the elements now composing it, a new condition which shall be honestly in harmony with and not repugnant to the law.  3d. That for the accomplish-

ment of these purposes, taking into view the difficulty
of the situation, a period of six months is allowed from the
receipt of our mandate, with leave, however, in the event,
in the judgment of the court below, the necessities of the
situation require, to extend such period to a further time
not to exceed sixty days.    4th. That in the event, before
the expiration of the period thus fixed, a condition of
disintegration in harmony with the law is not brought
about, either as the consequence of the action of the court
in determining an issue on the subject or in accepting a
plan agreed upon, it shall be the duty of the court, either
by way of an injunction restraining the movement of the
products of the combination in the channels of interstate
or foreign commerce or by the appointment of a receiver,
to give effect to the requirements of the statute.

Pending the bringing about of the result just stated,
each and all of the defendants, individuals as well as cor-
porations, should be restrained from doing any act which
might further extend or enlarge the power of the com-
bination, by any means or device whatsoever.    In view
of the considerations we have stated we leave the matter
to the court below to work out a compliance with the law
without unnecessary injury to the public or the rights
of private property.

While in many substantial respects our conclusion is in
accord with that reached by the court below, and while
also the relief which we think should be awarded in some
respects is coincident with that which the court granted,
in order to prevent any complication and to clearly define
the situation we think instead of affirming and modifying,
our decree, in view of the broad nature of our conclusions,
should be one of reversal and remanding with directions
to the court below to enter a decree in conformity with
this opinion and to take such further steps as may be neces-
sary to fully carry out the directions which we have given.

*And it is so ordered.*

MR. JUSTICE HARLAN concurring in part and dissenting in part.

:-I concur with many things said in the opinion just delivered for the court, but it contains some observations from which I am compelled to withhold my assent.

I agree most thoroughly with the court in holding that the principal defendant, the American Tobacco Company and its accessory and subsidiary corporations and companies, including the defendant English corporations, constitute a combination which, " in and of itself, as well as each and all of the elements composing it, whether corporate or individual, whether considered collectively or separately," is illegal under the Anti-trust Act of 1890, and should be decreed to be in restraint of interstate trade and an attempt to monopolize and a monopolization of part of such trade.

The evidence in the record is, I think, abundant to enable the court to render a decree containing all necessary details for the suppression of the evils of the combination in question. But the case is sent back, with *directions* further to hear the parties, by evidence or otherwise, "for the purpose of ascertaining and determining upon some plan or method of dissolving the combination, *and* of *recreating* out of the elements *now* composing it, a new condition" which shall not be repugnant to law. The court, in its opinion, says of the present combination, that its illegal purposes are overwhelmingly established by many facts, among others, " by the ever-present manifestation which is exhibited of a *conscious wrong-doing* by the form in which the various transactions were embodied from the beginning, ever changing, but ever in substance the same. Now the organization of a new company, now the control exerted by the taking of stock in one or another, or in several, so as to obscure the result actually attained, nevertheless uniform in their manifestations of the purpose to restrain

others, and to monopolize and retain power in the hands of the few, who, it would seem, from the beginning contemplated the mastery of the trade which practically followed. By the gradual absorption of control over all the elements essential to the successful manufacture of tobacco products and placing such control in the hands of seemingly independent corporations serving as perpetual barriers to the entry of others into the tobacco trade." The court further says of this combination and monopoly: "The history of the combination is so replete with the doing of acts which it was the obvious purpose of the statute to forbid, so demonstrative of the existence, from the beginning, of a purpose to acquire dominion and control of the tobacco trade, not by the mere exertion of the ordinary right to contract and to trade, but by methods devised to monopolize the trade, by driving competitors out of business, which were ruthlessly carried out, upon the assumption that to work upon the fears or play upon the cupidity of competitors would make success possible."

But it seems that the course I have suggested is not to be pursued. The case is to go back to the Circuit Court in order that out of the elements of the old combination a new condition may be "re-created" that will not be in violation of the law. I confess my inability to find, in the history of this combination, anything to justify the wish that a new condition should be "re-created" out of the mischievous elements that compose the present combination, which, together with its component parts, have, without ceasing, pursued the vicious methods pointed out by the court. If the proof before us—as it undoubtedly does—warrants the characterization which the court has made of this monster combination, why cannot all necessary directions be now given as to the terms of the decree? In my judgment, there is enough in the record to enable this court to formulate specific directions as to what the decree should contain. Such directions would

not only end this litigation, but would serve to protect the public against any more conscious wrong-doing by those who have persistently and "ruthlessly," to use this court's language, pursued illegal methods to defeat the act of Congress.

I will not say what, in my opinion, should be the form of the decree, nor speculate as to what the details ought to be. It will be time enough to speak on that subject when we have the decree before us. I will, however, say now that in my opinion the decree below should be affirmed as to the Tobacco company and its accessory and subsidiary companies, and reversed on the cross appeal of the Government.

But my objections have also reference to those parts of the court's opinion reaffirming what it said recently in the *Standard Oil Case* about the former decisions of this court touching the Anti-trust Act. We are again reminded, as we were in the *Standard Oil Case*, of the necessity of applying the "rule of reason" in the construction of this act of Congress—an act expressed, as I think, in language so clear and simple that there is no room whatever for construction.

Congress, with full and exclusive power over the whole subject, has signified its purpose to forbid *every* restraint of interstate trade, in whatever form, or to whatever extent, but the court has assumed to insert in the act, by construction merely, words which make Congress say that it means only to prohibit the "undue" restraint of trade.

If I do not misapprehend the opinion just delivered, the court insists that what was said in the opinion in the *Standard Oil Case*, was in accordance with our previous decisions in the *Trans-Missouri* and *Joint Traffic cases*, 166 U. S. 290, 171 U. S. 505, if we resort to *reason*. This statement surprises me quite as much as would a statement that black was white or white was black. It is scarcely just to the majority in those two cases for the

court at this late day to say or to intimate that they interpreted the act of Congress without regard to the "rule of reason," or to assume, as the court now does, that the act was, for the first time in the *Standard Oil Case*, interpreted in the "light of reason." One thing is certain, "rule of reason," to which the court refers, does not justify the perversion of the plain words of an act in order to defeat the will of Congress.

By every conceivable form of expression, the majority, in the *Trans-Missouri* and *Joint Traffic cases*, adjudged that the act of Congress did not allow restraint of interstate trade to any extent or in any form, and three times it expressly rejected the theory, which had been persistently advanced, that the act should be construed as if it had in it the word "unreasonable" or "undue." But now the court, in accordance with what it denominates the "rule of reason," in effect inserts in the act the word "undue," which means the same as "unreasonable," and thereby makes Congress say what it did not say, what, as I think, it plainly did not intend to say and what, since the passage of the act, it has explicitly refused to say. It has steadily refused to amend the act so as to tolerate a restraint of interstate commerce even where such restraint could be said to be "reasonable" or "due." In short, the court now, by judicial legislation, in effect amends an act of Congress relating to a subject over which that department of the Government has exclusive cognizance. I beg to say that, in my judgment, the majority, in the former cases, were guided by the "rule of reason;" for, it may be assumed that they knew quite as well as others what the rules of reason require when a court seeks to ascertain the will of Congress as expressed in a statute. It is obvious from the opinions in the former cases, that the majority did not grope about in darkness, but in discharging the solemn duty put on them they stood out in the full glare of the "light of reason" and felt and said time and again

that the court could not, consistently with the Constitution, and would not, usurp the functions of Congress by indulging in judicial legislation.   They said in express words, in the former cases, in response to the earnest contentions of counsel, that to insert by construction the word ".unreasonable" or "undue" in the act of Congress would be *judicial legislation.*   Let me say, also, that as we all agree that the combination in question was illegal under *any* construction of the Anti-trust Act, there was not the slightest necessity to enter upon an extended argument to show that the act of Congress was to be read as if it contained the word "unreasonable" or "undue."    All that is said in the court's opinion in support of that view is, I say with respect, *obiter dicta,* pure and simple.

These views are fully discussed in the dissenting opinion delivered by me in the *Standard Oil Case.*   I will not repeat what is therein stated, but it may be well to cite an additional authority.   In the *Trade-Mark Cases,* 100 U. S. 82, the court was asked to sustain the constitutionality of the statute there involved.   But the statute could not have been sustained except by inserting in it words not put there by Congress.   Mr. Justice Miller, delivering the unanimous judgment of the court, said: "If we should, in the case before us, undertake to make by *judicial construction* a law which Congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do."   This language was cited with approval in *Employers' Liability Cases,* 207 U. S. 463, 502.   I refer to my dissenting opinion in the *Standard Oil Case, ante,* p. 82, as containing a full statement of my views of this particular question.

For the reasons stated, I concur in part with the court's opinion and dissent in part.